## Edward SANTIAGO III, Petitioner, Appellant,

v.

## STATE of Minnesota, Respondent.

### No. C7–00–307.

Supreme Court of Minnesota.

May 23, 2002.

Frederick J. Goetz, Special Assistant State Public Defender, Minneapolis, MN, for Appellant.

Michael A. Hatch, Minnesota Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Michael Richardson, Assistant County Attorney, Minneapolis, MN, for Respondent.

Mark S. Wernick, Minneapolis, MN, for Amicus Curiae MN Association of Criminal Defense Lawyers.

## OPINION

PAUL H. ANDERSON, Justice.

Appellant Edward Santiago III was convicted of one count of murder in the second degree and two counts of attempted murder in the second degree. He was sentenced to 633 months in prison—480 months for second-degree murder, a consecutive term of 153 months for attempted murder, and a concurrent term of 214.5 months for attempted murder. Santiago subsequently brought a petition for post-conviction relief, asserting, among other claims, that the Hennepin County District Court abused its discretion in (1) joining him and a codefendant for trial, (2) denying his subsequent motions for severance, and (3) excluding certain evidence. The postconviction court denied Santiago's petition on all grounds and the Minnesota Court of Appeals affirmed. We granted review to consider the lower courts' severance and evidentiary rulings. We reverse and remand.

On the afternoon of July 16, 1997, Edward Santiago and Thomas Rodriguez, who are cousins, were in the outdoor pool area of the Hampton Place Apartments in Richfield, Minnesota, where Rodriguez's sister lived with her children. While in the pool area, Santiago and Rodriguez met several women, including Rhonda Watt (a resident of Hampton Place), Veronica Watt, Shirley Jones, and Tasha Davis. Rodriguez gave his telephone number to Davis.

The next day, Veronica Watt, Jones, Davis, Manyani Henderson, and Andre Patten were at Rhonda Watt's apartment for a barbeque. Davis, accompanied by Veronica Watt and Jones, went to the pool area to find Rodriguez because Davis had lost his telephone number. Davis found Rodriguez, but he refused to give her the original number and offered her another number instead. At that point, Veronica Watt became angry and told Davis not to waste her time on Rodriguez. Name calling ensued, after which Veronica Watt returned to Rhonda Watt's apartment with Davis and Jones. Within minutes, she returned to the pool area with Davis, Jones, and Rhonda Watt. When Veronica Watt approached Rodriguez, she pulled a knife out of her boot, yelled, and made stroking gestures toward Rodriguez with the knife. Rodriguez responded by leaving the area. Henderson and Patten arrived at the pool separately, before Veronica Watt's next encounter with Rodriguez.

After leaving the pool area, Rodriguez returned to his sister's apartment, where he found his sister, Santiago, Shedava Abram, and Tiffany Adams. Rodriguez told Santiago that some people at the pool were "trying to start some shit with him." Rodriguez then returned to the pool area with Santiago and the three others soon followed.

At this time, Eugene Webster and Blanchard Griffin were sitting in Web-

ster's van in the parking lot at the pool area drinking beer and supervising their children, who were playing in the pool. Webster observed a green Chevrolet driven by Santiago pull into the pool area parking lot. According to Webster, the car contained two passengers—Rodriguez and another unidentified man. Webster observed all three men get out and walk to the rear of the car. Next, Webster saw Veronica Watt, with a group of individuals behind her, "pounce" on Rodriguez. Webster testified that Santiago then directed Rodriguez and the other man to position themselves at 30 degree angles from him. Webster said that the confrontation between Rodriguez and Watt escalated and before long Henderson challenged Rodriguez to a fight.

At this moment, Webster left his van and asked the two groups to "hold it for a minute" while he retrieved his children. The situation then appeared to quiet down, so Webster left his children in the pool and returned to the van. However, the conflict erupted again. Webster, Jones, and Rhonda Watt all testified that as the confrontation escalated, they observed Santiago periodically reaching with his right hand into the left side of his sport coat. According to these witnesses, Santiago was behaving as though he was trying to give the impression that he had a gun. Webster also watched Rodriguez remove his jogging suit top and noted that Rodriguez was not carrying a gun.

Webster then saw Rodriguez and Santiago return to their car. According to Webster, Rodriguez opened the passenger-side door, leaned in to his waist, backed out, closed the door, and walked around the rear of the car and stood next to Santiago. Webster, Jones, and Rhonda Watt all testified that they then observed movement between the two that was consistent with the transfer of a gun from Santiago to Rodriguez, but stated that they did not actually see anything pass between them. Henderson testified that he observed Santiago give Rodriguez a gun and Webster confirmed that Henderson had a better line of sight than Webster. Webster and Jones also testified that they heard Santiago say several times to Rodriguez "take care of your business" or "handle your business." Rhonda Watt testified that she heard Santiago say "handle your business" once to Rodriguez.

Rodriguez then went back around the rear of the car and at this point Webster observed that Rodriguez was carrying a gun in the waistband of his shorts. Webster went to the front of the van and yelled at the children to get out of the pool. Webster heard Veronica Watt tell Rodriguez that she too had a gun and that she would go and get it "if we're going to play that way." Webster observed Patten trying to calm Watt down and to get her to leave. Rodriguez then shot Patten. Rodriguez fired several more rounds toward Henderson and Watt, who were attempting to flee. Henderson was shot on his right side and Abram was shot in both feet. Rodriguez then walked toward Patten and fired more shots at him as he lay on the ground. Patten died from the gunshot wounds.

After the shooting, Santiago and Rodriguez left the pool area and Rodriguez drove to the home of his uncle, Jose Rodriguez. Rodriguez told his uncle that he "shot somebody and Shedava [Abram]." Rodriguez then made several telephone calls to Santiago. Rodriguez's sister arrived and brought a bundle from the back of the car into the residence. Rodriguez's sister then gave Jose Rodriguez the bundle she had taken out of the car. This bundle contained the gun used in the shooting. Then, Santiago arrived and he and Rodriguez left in the car. Police offi-

cers stopped the car a short distance from Jose Rodriguez's residence. Rodriguez jumped out of the passenger seat and an officer apprehended him as he attempted to flee. Santiago remained in the car and also was arrested.

Santiago and Rodriguez were each charged with murder in the second degree, in violation of Minn.Stat. § 609.19, subd. 1(1) (1996), Minn.Stat. § 609.11 (1996 & Supp.1997), and Minn.Stat. § 609.05 (2000), and two counts of attempted murder in the second degree in violation of Minn.Stat. § 609.19, subd. 1(1), Minn.Stat. § 609.17 (2000), Minn.Stat. § 609.11, and Minn.Stat. § 609.05. The state moved for joinder under Minn. R.Crim. P. 17.03, subd. 2(1), and Minn.Stat. § 631.035 (2000). The state argued that the 1990 amendments to the Minnesota Rules of Criminal Procedure constituted a major change in Minnesota's joinder practice and moved Minnesota in the direction of the Federal Rules of Criminal Procedure, which carry a presumption of joinder. *See* Fed.R.Crim.P. 8(b), 14. In support of its motion, the state offered its theory of the case, which was that Santiago was "calling the shots"; Rodriguez was scared and unsure of himself; and Santiago handed the gun to Rodriguez and told Rodriguez to take care of Rodriguez's business.

Santiago opposed joinder, contending that Minn. R.Crim. P. 17.03, subd. 2(1) should be interpreted in accordance with Minnesota's long-standing policy against joinder. Santiago claimed that the state's reliance on federal severance standards, particularly as articulated in *Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), was misplaced. Santiago then asserted that joinder would be prejudicial to him for three reasons. First, he expected to defend himself by demonstrating that he did nothing to facilitate the commission of the crime and that

Rodriguez alone was guilty. Second, he would be unable to obtain exculpatory testimony from Rodriguez at a joint trial because Rodriguez would invoke his right to remain silent. According to Santiago, if Rodriguez testified truthfully, he would testify that Santiago did not aid or abet him in any way. Third, he and Rodriguez would have antagonistic defenses, which would in essence make Rodriguez a second prosecutor against him. Santiago proffered the statements of two witnesses in support of his defense theory.

Rodriguez also opposed the joinder motion. He contended that Minnesota's rules embodied a presumption against joinder and, under the separation of powers doctrine, a district court has the discretion to decide whether defendants should be joined for trial. In addition, Rodriguez asserted that the federal cases and rules were inapplicable and, even if they did apply, *Zafiro* was distinguishable because *Zafiro* involved mutual ignorance rather than antagonistic defenses. Rodriguez went on to contend that the state had not demonstrated sufficient prejudicial impact or trauma on the victims to warrant joinder. Finally, Rodriguez argued that he and Santiago had raised inconsistent defenses.

The district court granted the state's motion for joinder. The court noted that the presumption against joint trials was no longer the law either by rule or by statute and the court had the discretion to join the defendants. Addressing the criteria set forth in Minn. R.Crim. P. 17.03, subd. 2(1), the court concluded that the defendants would not be prejudiced by a joint trial. The court found that the interests of justice did not compel separate trials because even though the defendants had asserted inconsistent defenses, "nothing specific [was] identified" and there was no evi-

dence admissible as to only one of the defendants.

On January 30, 1998, Santiago made his first pretrial motion for severance. He asserted that a joint trial would deny him the right to a fair trial and due process of law as guaranteed under both the federal and state constitutions. Santiago made his motion under Minn. R.Crim. P. 17.03, subd. 3, but in his memorandum of law he based his motion on subdivision 2(1) and Minn.Stat. § 631.035. Santiago's attorney provided a supporting affidavit, stating that the testimony of two witnesses would show that Rodriguez acted alone. First, the defendants' grandmother would testify that the gun used to commit the crime belonged to Rodriguez, Rodriguez frequently carried this gun, and Rodriguez possessed the gun a few days before the shooting. Second, the defendants' uncle would testify that the gun belonged to Rodriguez. Santiago's memorandum of law also noted that Rodriguez had given statements in the course of Rule 20 evaluations that directly inculpated Santiago. Santiago cited Rodriguez's statements to psychological examiners that (1) Santiago had the argument that led to the shooting, (2) Santiago had a gun and attempted to hand it to Rodriguez, (3) Rodriguez either refused the gun or dropped it, and (4) Santiago then picked up the gun and started shooting.

The district court denied the severance motion, finding that neither Santiago nor Rodriguez had presented any statement that raised issues of irreconcilable or mutually exclusive defenses under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The court also found that neither defendant had presented his "defense in a manner clearly admissible in the other defendant's trial." The court said:

Defendant Santiago asserts as his defense, through counsel rather than by direct statement, that he never possessed the involved weapon. Defendant Rodriguez, on the other hand, asserts through protected statements made to court-ordered Rule 20 examiners, that he never possessed the involved weapon. Each defendant, then, claims to have raised an "irreconcilable" defense as to the other without in any way having asserted such a defense in a manner clearly admissible in the other defendant's trial. If severance would be granted at this juncture, both could freely assert his Fifth Amendment right to remain silent in the other's trial.

Had each of the defendants asserted their respectively claimed defenses in a judicially admissible setting, they might be considered potentially "irreconcilable" for purposes of a severance motion. However, as presented, they cannot since neither defendant is bound to anything until tactical decisions play out at trial. * * * * Should the defendants make a *judicially admissible* Offer of Proof of their asserted "irreconcilable" and "mutually exclusive" defense(s), the trial court may well entertain a request for severance prior to trial.

(Emphasis in original.) In reaching its decision, the court stated it was relying on the holdings of *State v. Thibodeaux*, 315 So.2d 769 (La.1975), *United States v. Hernandez*, 952 F.2d 1110 (9th Cir.1991), *United States v. Bruno*, 809 F.2d 1097 (5th Cir.1987), and *Zafiro*, 506 U.S. at 541–45, 113 S.Ct. 933 (Stevens, J., concurring).

On February 19, Santiago made his second pretrial motion for severance and attempted to establish a factual basis for relief. The hearing on this motion was held before a judge other than the one who had ruled on joinder and the first severance motion. The second judge who heard

the February 19 severance motion is the judge who ultimately presided at the joint trial. At this hearing, Santiago's attorney made oral representations to the court on the record that he expected witnesses to testify that (1) Rodriguez was the shooter, (2) Rodriguez always had the gun on his person, (3) Rodriguez's relatives saw Rodriguez with the gun a week before the shooting, and (4) Rodriguez was advised by certain individuals to lie and to pin the murder on Santiago. In addition, the attorney asserted that a 911 tape would show that there was one shooter who acted alone and drove off alone.

At this hearing, Rodriguez's defense theory was that Santiago was the shooter. Rodriguez's attorney informed the court that Rodriguez would probably take the stand and testify that he was not the shooter. The attorney also proffered that another witness—Tawan Williams—would testify that Santiago was a gang member, one of the victims was a member of a rival gang, Santiago was previously shot by a member of the rival gang, and Santiago shot the victims to get revenge.

In response to this motion, the state asserted that Santiago's arguments presented nothing new and, thus, there was no factual basis for granting the severance motion. The state did acknowledge that a joint trial would be "a close call" if the information presented by Rodriguez were admissible, but asserted that, as it now stood, there was an insufficient factual basis for Rodriguez's proffer. The state then requested that Williams be called to testify. Rodriguez's attorney responded that the state's argument was based on admissibility and the weight of the evidence and such issues should be addressed at trial. Rodriguez's attorney then refused to permit Williams to testify at a mini-trial before the trial, asserting that this level of

proof was not required of witnesses for the state or Santiago. The attorney said:

> Short of putting my client on the stand, I cannot present you with any more information than what I believe he's going to present in court. As far as Mr. Williams, at this point I cannot give you a statement. I can tell you what he told us and what we expect him to testify to. I cannot comment upon its reliability or weight or anything like that.

The district court then wondered aloud about how it could make a substantive determination of potential prejudice without witnesses or any statements. The court went on to explain that Rodriguez and Santiago had proffered the expected testimony of witnesses and that the expected testimony was "speculative." The court then explained that if the witnesses were permitted to testify and did testify as the attorneys expected, "at that point we have a problem." The attorney for Santiago then asserted that both defense counsel were officers of the court and, based on their proffers, the court had sufficient information to decide the severance issue. The court did not specifically address this assertion.

The district court proceeded to question the attorneys about the difference between Minnesota's severance rules and the federal severance rules. The state argued that federal severance standards should apply because the language in Minn.Stat. § 631.035 was not substantially different from that of Fed.R.Crim.P. 8(b). Moreover, the state argued that the legislature intended to adopt the federal rule's presumption of joinder when it enacted the statute. However, the state did acknowledge that the rules of criminal procedure supersede a statute if there is a conflict, but insisted that there was no conflict.

Santiago's attorney contended that there was indeed a conflict between Minnesota's

rules and the federal rules and requested an opportunity to review a copy of the federal rule. The district court denied the request. The court then advised the attorneys that if Minnesota case law before the 1990 amendments applied, Santiago's "severance motion has a lot of legs," but if the new rule was the same as the federal rule, then the severance argument would fail. In the end, the court denied the motion for severance on the grounds that the evidence would be the same in both trials, the new amended rules on severance are modeled on the federal rules, and there was no prejudice to the defendants.

At a pretrial evidentiary hearing on February 23, Santiago renewed his motion for severance. Santiago acknowledged that Rodriguez had the constitutional right to suppress the testimony of Blanchard Griffin, a witness who identified Rodriguez as the shooter and who would testify that the gun did not change hands.[1] Santiago asserted that the testimony of this witness was crucial to his defense and would be admissible at his trial if there were separate trials. The district court observed that this was a new offer of proof to the court regarding severance. The court noted that Santiago's prior severance motions were based on "pure speculation" regarding the prospective testimony of witnesses, but now there was evidence regarding the prospective testimony of one witness. Nevertheless, the court denied the motion.

On March 6, Santiago again renewed his motion for severance during a pretrial hearing on several motions in limine. Santiago contested the state's motion to suppress evidence prejudicial to Rodriguez on the grounds that it was relevant to his own defense. This time, the evidence contested was the testimony of additional witnesses that, several days before the shooting, Rodriguez carried a gun that looked like the murder weapon. Santiago claimed that this evidence was relevant to his defense that he never had the gun and never passed it to Rodriguez. The court denied the motion.

On March 10, the jury was sworn and the trial began. Following opening statements, both Santiago and Rodriguez moved for severance. Santiago based his motion on the theories set forth in the opening statements. The state had argued that Rodriguez was the shooter, but that Santiago handed Rodriguez the gun and told him to "take care of your business." Santiago represented that he did not pass a gun to Rodriguez and that he neither directed nor encouraged Rodriguez's actions. In Rodriguez's short opening statement, his attorney asserted that Rodriguez was 19 years old, had no criminal record, and was nearly mentally retarded. Rodriguez's attorney then said, "Think about that [Rodriguez's mental capacity] when you think about the power structure that is going to become clear to you in this case." The attorney also implored the jury to scrutinize the motives of the witnesses in the case and stated that he agreed with the state's request that the jury carefully listen to the testimony of certain disinterested witnesses. The district court denied Santiago's motion for severance for the same reasons it had previously denied severance.

On March 12, Santiago moved for severance for the sixth time, this time on the grounds that part of Rodriguez's defense theory was that Rodriguez lacked the mens rea for second-degree murder. According to Santiago, Rodriguez was at-

---

1. Griffin was presented with a photo line-up and identified Rodriguez as the shooter. However, because Griffin was not certain of his identification of Rodriguez as the shooter, the court suppressed the identification.

tempting to prove that Santiago "directed" Rodriguez to shoot the victims in order to establish that he (Rodriguez) had committed the lesser crime of either third-degree murder or manslaughter.

Santiago also asserted that Rodriguez's cross-examination of two witnesses—Eugene Webster and Rhonda Watt—was antagonistic to Santiago's position. Webster and Watt were witnesses to the events before the shooting and the shooting itself. The state, on direct examination, obtained testimony from both witnesses supporting its theory of the case. While questioning Webster, the state repeatedly used the term "the director" to refer to Santiago and suggested to Webster that he use the term "the director" to refer to Santiago, which he did. On cross-examination of Webster, Santiago's attorney obtained testimony indicating that Santiago was an observer rather than the director and that Rodriguez acted alone. Then, on cross-examination of Webster and Watt, Rodriguez's attorney sought to discredit the testimony elicited by Santiago's attorney and to reinstate the theory of the state. While questioning Webster, Rodriguez's attorney also used the term "the director" to refer to Santiago. The district court denied Santiago's motion for severance, stating that Webster's and Watt's testimony did not provide sufficient grounds for severance.

Santiago's final motion to sever came on March 19, at the close of the state's case. The motion was denied. In his closing statement, Rodriguez's attorney stated that Rodriguez "clearly did do the shooting," but contended that Rodriguez did not have the intent to kill. On March 25, the district court explained that severance would have led to an incomplete picture of

what occurred and the interests of justice supported a joint trial.

Santiago and Rodriguez were each found guilty of second-degree murder and two counts of attempted second-degree murder. Santiago, with criminal history points, was sentenced to 633 months in prison—480 months for second-degree murder, a consecutive term of 153 months for attempted murder, and a concurrent term of 214.5 months for attempted murder. Rodriguez, with no criminal history points, was sentenced to a prison term of 306 months for second-degree murder, a concurrent term of 173 months for attempted murder, and a concurrent term of 193 months for attempted murder.

Following his conviction, Santiago filed an appeal, but subsequently moved for a remand to the district court so that he could petition for postconviction relief on the grounds of newly-discovered evidence. The court of appeals dismissed Santiago's appeal. On January 20, 1999, Santiago filed a petition for postconviction relief. In his petition, Santiago requested a new trial on numerous grounds, including that the district court first erred by joining the two defendants for trial and then by failing to sever the trials. According to Santiago, the court should have granted severance because he suffered prejudice as a result of antagonistic defenses.

One year later, on January 21, 2000, the postconviction court, which was the same court that presided over Santiago's joint trial with Rodriguez, denied Santiago's petition. The court began its analysis by stating that Santiago's joinder claim is governed by Rule 17.03, subd. 2(1), and that Santiago's severance claims are governed by Rule 17.03, subd. 3(3). The court found that Rule 17.03, after it was amended,[2] closely resembles the federal rules

---

**2.** The postconviction court and the court of appeals both refer to the "1987" amendments

to the rules. Rule 17.03 was revised by this court in 1989 and the revisions were effective

regarding joinder and severance. The court, in interpreting subdivision 3(3), took guidance from the federal rules as well as two of our cases that were decided after Santiago's trial—*State v. DeVerney,* 592 N.W.2d 837 (Minn.1999), and *State v. Greenleaf,* 591 N.W.2d 488 (Minn.1999).

The postconviction court held that granting the state's motion for joinder was proper because the district court, in making its decision, had considered all of the factors listed in subdivision 2(1). The court also held that the district court properly denied Santiago's pretrial and midtrial severance motions because, under subdivision 3(3), there was no manifest necessity to sever the trials and there was no substantial prejudice to Santiago as a result of being jointly tried with Rodriguez. Relying on *DeVerney,* the court stated that the test for substantial prejudice is whether the defenses are inconsistent or whether the defendants seek, through their defenses, to shift the blame to one another. Applying this test, the court concluded that as in *DeVerney* and *Greenleaf,* the jury was faced with the choice between the state's theory and the defendants' theories. The court also concluded that even if the defenses were antagonistic, the presence of antagonistic defenses is not prejudicial per se under the federal rules and *Zafiro.* Finally, the court rejected Santiago's other claims, including the claim that newly-discovered evidence warranted a new trial.

Santiago appealed the postconviction court's decision and the court of appeals held that the district court did not abuse its discretion. *Santiago v. State,* 617 N.W.2d 632, 639 (Minn.App.2000). In analyzing the propriety of the court's severance rulings, the court of appeals relied on the standards set forth in Rule 17.03,

subds. 2(1) and 3(3), and federal case law. The court observed that Rule 17.03 had been changed and no longer carries a "preference" for separate trials. It then noted that although *DeVerney* and *Greenleaf* were decided under the new version of Rule 17.03, these cases did not involve antagonistic defenses, so they were not controlling in evaluating Santiago's claims. The court then turned to *Zafiro* and *United States v. Shivers,* 66 F.3d 938, 940 (8th Cir.1995), for the proposition that a defendant, to prove that joinder is prejudicial, must demonstrate irreconcilable defenses or that the jury could not separate the evidence relating to each defendant.

The court of appeals concluded that there was no manifest necessity to sever and that Santiago did not suffer prejudice as a result of the joint trial. The court gave two reasons for its conclusion. First, before the trial, the district court considered all of the factors listed in subdivision 2(1) and determined that severance was not warranted because Santiago did not show prejudice or specifically identify inconsistent defenses. Second, after the evidence was submitted, the district court instructed the jury in a manner that reduced the risk of prejudice. Accordingly, the court of appeals held that the district court did not abuse its discretion. The court of appeals also held that the district court's evidentiary rulings did not constitute an abuse of discretion.

We granted review to consider the propriety of the district court's rulings on severance and the exclusion of evidence. The question of whether the court erred when it initially joined Santiago and Rodriguez for trial was not appealed and is not before us.

---

on January 1, 1990. Minn. R.Crim. P. 17.03. The lower courts may have confused the date the rule was revised with the date section

631.035 was enacted. *See* Act of June 3, 1987, ch. 395, § 1, 1987 Minn. Laws 2972, 2973.

## I.

■ The two key issues before us are whether the district court erred in denying Santiago's pretrial and midtrial severance motions. The court of appeals dismissed Santiago's direct appeal so that he could pursue postconviction relief. We use the standard of review for direct appeals when a defendant first files a direct appeal, subsequently moves for an order staying the direct appeal in order to proceed with a postconviction hearing, and the court of appeals then dismisses the direct appeal. *See State v. Steele*, 449 N.W.2d 157, 157–58 (Minn.1989). Thus, even though this is a postconviction petition, the standard of review normally applied to Santiago's direct appeal issues is the standard to be used here.

The district court denied Santiago's severance motions on the grounds that there was no potential prejudice to the defendants as a result of a joint trial and because Santiago's offer of proof in support of his argument that the defendants had antagonistic defenses was insufficient. The postconviction court and the court of appeals concluded that Santiago's severance motions were properly denied because there was no manifest necessity to sever and because the codefendants did not suffer prejudice as a result of the joint trial. Determining whether the district court erred requires us to address certain preliminary issues, including (1) what Minnesota's standards for pretrial and midtrial severance are, (2) why Minnesota has different standards for pretrial and midtrial severance, (3) how to reconcile the differences between statutory severance standards and the severance standards articulated in our rules, and (4) whether the district court applied the correct standard to Santiago's offer of proof for his motions. We begin with a review of the evolution of Minnesota's joinder and severance standards.

### A. The Evolution of Minnesota's Joinder and Severance Standards

The evolution of Minnesota's joinder and severance standards reflects the interplay of the common law, statutes, and our rules of criminal procedure. Under the common law, a district court had the discretion to grant or refuse separate trials. *State v. Thaden*, 43 Minn. 325, 326, 45 N.W. 614, 615 (1890). This standard was altered by statute, which gave a defendant charged with a felony an absolute right to a separate trial. Gen.Stat. 1878, c. 114, § 6. In 1969, the statute was amended to permit a joint trial in the interests of justice:

> When two or more defendants shall be jointly indicted or informed against for a felony, they shall be tried separately, provided, however, upon written motion, the court, in the interest of justice and not related to time or economy may order a joint trial for any two or more said defendants.

Act of May 27, 1969, ch. 801, § 1, 1969 Minn. Laws 1477 (codified at Minn.Stat. § 631.03 (1969)). The amended statute permitted joinder in the interest of justice, but continued the policy of strongly favoring separate trials. *State v. Swenson*, 301 Minn. 199, 201, 221 N.W.2d 706, 708 (1974).

The Minnesota Rules of Criminal Procedure became effective on July 1, 1975. The joinder of defendants in felony and gross misdemeanor cases was governed by Rule 17.03, subd. 2(1), which closely mirrored the language of section 631.03. Minn. R.Crim. P. 17.03, subd. 2(1) (1975). Subdivision 2(1) provided:

> When two or more defendants shall be jointly charged with a felony, they shall be tried separately provided, however, upon written motion, the court in the interests of justice and not solely related to economy of time or expense may or-

der a joint trial for any two or more said defendants.

*Id.* The improper joinder of defendants—misjoinder—was addressed in a separate subdivision,[3] subdivision 3, which provided that "[m]isjoinder of offenses or charges or defendants shall not be grounds for dismissal, but on motion, offenses or defendants improperly joined shall be severed for trial." Minn. R.Crim. P. 17.03, subd. 3 (1975).

The text of the 1975 rule, coupled with the rule's comments, indicate that there were separate severance standards for misjoined and properly joined defendants. The comments explained that under subdivision 3, severance was mandatory for misjoined defendants, but severance of properly joined defendants was governed by subdivision 2's standards. Minn. R.Crim. P. 17.03 cmt. (1975). Therefore, subdivision 2 provided a single standard for joinder and severance of properly joined defendants and this standard was the same regardless of whether the severance motion was made before or during trial.

In 1987, the legislature enacted Minn. Stat. § 631.035 (Supp.1987), which removed the presumption in favor of separate trials contained in section 631.03. *See* Act of June 3, 1987, ch. 395, § 1, 1987 Minn. Laws 2972, 2973. The new statute granted a court the discretion to decide whether to order joint or separate trials based on certain factors. The factors to be considered are the nature of the offense charged, the impact of the offense on the victim, the potential prejudice to the defendant, and interests of justice. Minn. Stat. § 631.035. Section 631.035 specifically provided:

When two or more defendants are jointly charged with a felony, they may be tried separately or jointly in the discretion of the court. In making its determination on whether to order joinder or separate trials, the court shall consider the nature of the offense charged, the impact on the victim, the potential prejudice to the defendant, and the interests of justice.

*Id.*

The most recent amendments to the rules of criminal procedure regarding joinder and severance became effective on January 1, 1990. The revised rule mirrors the 1987 version of the statute. Subdivision 2(1) now provides:

When two or more defendants are jointly charged with a felony, they may be tried separately or jointly in the discretion of the court. In making its determination on whether to order joinder or separate trials, the court shall consider the nature of the offense charged, the impact on the victim, the potential prejudice to the defendant, and the interests of justice.

Minn. R.Crim. P. 17.03, subd. 2(1).

Under the current version of the rules, subdivision 3 continues to provide that misjoinder of offenses is not grounds for dismissal but that, on motion, defendants improperly joined shall be severed for trial. *Id.,* subd. 3. However, the current version includes a new provision, subdivision 3(3), which details a different standard for severance of defendants during trial. *Id.,* subd. 3(3). This subdivision, for the first time, introduced the concept of manifest necessity:

The court shall sever defendants during trial with the defendant's consent or

---

**3.** Misjoinder also can occur when a defendant is charged with only one of several unrelated offenses in a multicount indictment. ABA Standards for Criminal Justice, 13–3.2(b) cmt. (2d ed. 1980 & Supp.1986).

upon a finding of manifest necessity, if the court determines severance is necessary to achieve a fair determination of the guilt or innocence of one or more of the defendants.

*Id.* The comments to Rule 17.03 explain that subdivision 3(3) was derived from Unif. R.Crim. P. 472(b)(2)(ii) (1987), which is based on the ABA Standards for Criminal Justice 13–3.2(b)(ii) (2d ed.1980 & Supp.1986) (hereinafter referred to as "ABA Standards"). The comments also state that "[w]hen defendants are properly already joined, severance is governed by Rule 17.03, subd. 2 and Rule 17.03, subd. 3." Minn. R.Crim. P. 17.03 cmt.

■ Subdivisions 2 and 3 set the standard for severance for defendants who are properly joined. While the heading of subdivision 2(1) refers only to joinder of defendants, this subdivision also provides the rule for pretrial severance. Indeed, we reached this conclusion in *DeVerney* and evaluated the defendant's joinder and pretrial severance claims under subdivision 2(1). 592 N.W.2d at 841–42. The plain language of the rule establishes that subdivision 3(3) governs midtrial severance. Thus, the current version of Rule 17.03 contemplates one standard for joinder and pretrial severance and a different standard for midtrial severance. It is crucial to our analysis to understand that this scheme is different from that contained in the 1975 version of the Rules, which employed an identical standard for joinder, pretrial severance, and midtrial severance of properly joined defendants. *See* Minn. R.Crim. P. 17.03 (1975).

In 1992, the legislature amended section 631.035, Act of Apr. 29, 1992, ch. 571, art. 9, § 1, 1992 Minn. Laws 1983, 2056. The statute reduced the factors the court must consider in evaluating whether severance is warranted. Minn.Stat. § 631.035. Subdivision 2 of the statute, which governs severance, now provides:

> If it appears that a defendant is prejudiced by a joinder of defendants in a complaint or indictment or by joinder for trial together, the court may, upon motion of the defendant or the court's own motion, order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires. In making its determination, the court shall consider the impact on the victim.

*Id.*, subd. 2. There have been no changes in the statute since 1992. Rule 17.03 has not been amended since 1990.

## B. Santiago's Offer of Proof

It is against the backdrop of the foregoing historical evolution of Rule 17.03 that we begin our analysis of whether the district court erred in denying Santiago's pretrial and midtrial severance motions. When determining whether Santiago suffered prejudice because of antagonistic defenses, we must first examine the propriety of the standard used by the district court in determining that Santiago's offer of proof was insufficient. We must do so because when considering Santiago's January 30 motion, the court stated that "[h]ad each of the defendants asserted their respectively claimed defenses in a judicially admissible setting, they might be considered potentially 'irreconcilable' for purposes of a severance motion." Further, in evaluating Santiago's February 19 motion, the court acknowledged that if the witnesses for Santiago testified as expected, a joint trial would be "a problem."[4] Thus, even though the court acknowledged that

---

4. The record does not reflect the reasons for the court's pretrial severance rulings of February 23 and March 6.

Santiago had presented information indicating that the defenses were antagonistic, it denied the motions on the grounds that they were not supported by admissible evidence. In essence, the court established a heightened standard for Santiago's offer of proof by requiring that the offer be made in a judicially admissible setting. We now consider whether this heightened standard was appropriate.

An offer of proof provides an evidentiary basis for a district court's decision. We review a court's rulings on the sufficiency of offers of proof under an abuse of discretion standard. *See State v. Kasper*, 409 N.W.2d 846, 847–48 (Minn. 1987). There are two principal ways to make an offer of proof. First, an attorney can tell the court what the proposed testimony of the witness will be. Thomas A. Mauet, *Trial Techniques* 469–70 (5th ed.2000). Second, an attorney can examine a witness and produce the testimony. *Id.* The first method constitutes a sufficient offer of proof "if it is sufficiently specific and there is nothing in the record to indicate a want of good faith or inability to produce the proof." John W. Strong, ed., *McCormick on Evidence* 220 (5th ed.1999) (citations omitted).

The sufficiency of an offer of proof is typically contested when the issue before the district court is the admissibility of evidence. In this context, an offer of proof provides the court with an opportunity to ascertain the admissibility of the proffered evidence and provides a record for a reviewing court to determine whether the lower court ruling was correct. However, in Santiago's situation, the issue before the court was not whether certain evidence was admissible. Rather, the issue was whether Santiago was entitled to a separate trial. We have not held that only admissible evidence may be considered in evaluating pretrial severance motions. In fact, we have not articulated a standard for offers of proof for such motions.

Minnesota Rules of Evidence 103(b), which sets forth the standards for making a record of an offer of proof, grants a district court discretion as to the method of the proffer. In practice, Minnesota courts permit an attorney to make a proffer by informing the court of a witness's expected testimony. *See, e.g., Shorter v. State*, 511 N.W.2d 743, 745–46 (Minn.1994) (explaining that defense attorney made proffer as to the testimony of witnesses and court refused to hear testimony and permitted only argument from counsel); *Dunshee v. Douglas*, 255 N.W.2d 42, 47 (Minn.1977) (holding that defense counsel's memorandum summarizing expected testimony of a witness was a sufficient proffer).

We have previously declined to restrict the discretion of a district court by either imposing or prohibiting a heightened proffer standard. For example, in the context of *Spreigl*[5] hearings on the admissibility of evidence, a court has broad discretion in determining whether to require the state to call witnesses. *State v. Lindahl*, 309 N.W.2d 763, 766 (Minn.1981). We have held that it is not necessary to require the state to call a victim at a *Spreigl* hearing in order to have the court weigh the credibility of the victim, even when the victim's testimony is the only evidence that the offense occurred. *Kasper*, 409 N.W.2d at 848. In rejecting the requirement of a mini-trial on *Spreigl* evidence, we observed that the standards for professional conduct helped to insure that

---

**5.** Evidence of other crimes or bad acts by a defendant offered to show identity, plan, knowledge, or modus operandi is commonly referred to as *Spreigl* evidence after our decision in *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965).

prosecutors do not intentionally give an inaccurate statement of what the *Spreigl* evidence will be. 409 N.W.2d at 847. Similarly, in the context of intrafamilial sexual abuse cases, we have held that a court does not need to conduct a mini-trial before admitting as substantive evidence the out-of-court statements made by a child concerning sexual contact. *State v. Dana*, 422 N.W.2d 246, 249 (Minn.1988). Thus, a witness who is expected to summarize the child's statements does not need to testify separately out of the presence of the jury before giving trial testimony. *Id.*

Here, the district court imposed a heightened standard on Santiago by requiring admissible evidence to support his defense theory. As previously noted, Minn. R. Evid. 103(b) gives a court discretion regarding the method of proof. To determine whether imposing a heightened standard constitutes an abuse of discretion, we need to ascertain the relevant factors a court must consider when deciding the sufficiency of an offer of proof for pretrial severance motions.

Based on our prior cases and also drawing upon the standards articulated by McCormick, a district court, when considering a pretrial severance motion, should first determine whether the proffered evidence is sufficiently specific and whether there is anything in the record to indicate a want of good faith. When the offer of proof is not sufficiently specific or there is something in the record to indicate a want of good faith, a court may impose a heightened proffer standard. However, when a court imposes a heightened standard, it should articulate on the record the reasons for adopting such a standard. In doing so, the court must keep in mind that, in a criminal trial, the defendant "may remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion."

James H. Chadbourn, *Wigmore on Evidence* § 2511 (1981). The court must also remember that it is bound by the defendant's Fifth Amendment privilege against self-incrimination. This procedure is flexible and gives the court discretion to require that the offer of proof meet a heightened standard if representations to the court lack sufficient specificity or reliability.

Santiago's offer of proof for his first motion consisted of (1) an affidavit of his attorney listing the witnesses he expected to call at trial, together with their expected testimony, and (2) a memorandum of law which identified statements made by Rodriguez to psychological examiners inculpating Santiago. Santiago's offer of proof for his second motion consisted of (1) oral representations on the record by his attorney regarding the expected testimony of certain witnesses, and (2) a 911 tape. Santiago's proffer for the remaining two pretrial severance motions consisted of oral representations and arguments on the record by his attorney during evidentiary hearings.

After reviewing Santiago's offers of proof, we conclude that they were sufficiently specific and that they linked the expected testimony to Santiago's expected defense theory. Further, there is no indication that Santiago's attorney made these offers of proof in bad faith. Accordingly, we conclude that the district court abused its discretion when it imposed a heightened standard by demanding judicially admissible evidence from Santiago.

## C. Pretrial Severance

We next proceed to evaluate whether the district court erred in denying Santiago's pretrial severance motions. Santiago's first and second pretrial severance motions were based on Rule 17.03, subd. 2(1), and section 631.035. The third and

fourth motions were made in the context of evidentiary hearings and the record does not reflect whether the motions were based on the rule, the statute, or both.

■■■■■ Section 631.035's joinder and severance standards differ with those articulated in Rule 17.03, subd. 2(1). While the statute requires that a court must consider two factors when evaluating whether severance is proper, the rule provides that a court must consider four factors. Therefore, we must determine whether the statute or the rule takes precedence. We have the authority to "regulate the pleadings, practice, procedure, and the forms thereof in criminal actions in all courts of this state, by rules promulgated by [our court] from time to time." Minn. Stat. § 480.059, subd. 1 (2000). This authority arises from our inherent powers. *State v. Willis*, 332 N.W.2d 180, 184 (Minn. 1983). In matters of procedure rather than substantive rights, the rules of criminal procedure take precedence over statutes to the extent that there is any inconsistency. Minn.Stat. § 480.059, subds. 1, 7 (2000), *State v. Johnson*, 514 N.W.2d 551, 554 (Minn.1994); *State v. Wingo*, 266 N.W.2d 508, 513 (Minn.1978). Because severance is a matter of procedure, Santiago's pretrial severance claims should be evaluated under Rule 17.03, subd. 2(1), rather than under the statute. *See DeVerney*, 592 N.W.2d at 841–43 (analyzing pretrial severance claim under subdivision 2(1) rather than section 631.035). Therefore, the district court erred to the extent that it may have based its decision on the statute.

A court evaluates whether a joint trial is proper in light of the nature of the offense charged, the impact on the victim, the potential prejudice to the defendant, and the interests of justice. Minn. R.Crim. P. 17.03, subd. 2(1). Here, the district court identified and evaluated the state's motion

for joinder in the context of all four factors. However, when evaluating Santiago's subsequent pretrial severance motions, the court only focused on the third factor—potential prejudice to the defendant. Santiago's petition also focuses on this factor. Therefore, the primary focus of our analysis will be on whether the court properly evaluated the potential prejudice to Santiago.

■■■■ Santiago claims that severance was warranted because he and Rodriguez presented antagonistic defenses. In reviewing a district court's pretrial severance decisions, we make " 'an independent inquiry into any substantial prejudice to defendants that may have resulted from their being joined for trial.' " *DeVerney*, 592 N.W.2d at 842 (quoting *State v. Hathaway*, 379 N.W.2d 498, 502 (Minn.1985)).

Our most recent articulation of pretrial severance standards in the context of antagonistic defenses appears in a trilogy of decisions beginning in 1985. In *State v. Hathaway*, we applied the 1975 version of Rule 17.03, concluded there was no substantial prejudice, and upheld the district court's refusal to sever a defendant's murder trial from that of his codefendant. 379 N.W.2d at 502–03. We concluded that the defendants regularly adopted the motions and objections of the other and did not present antagonistic defenses. *Id.* at 503. We then explained that antagonistic or inconsistent defenses exist when defendants seek to blame each other, but that mere differences in trial strategy do not constitute substantial prejudice. *See id.* at 503. We stated:

> This is not a case in which the state introduced evidence that showed only one of the defendants killed the victim, thus forcing each defendant to "point the finger" at the other. Nor is this a case in which the jury was forced to believe either the testimony of one de-

fendant or the testimony of the other. Instead, the jury was faced with the choice between the state's theory * * * and the theory* * * expounded by both defendants * * *.

*Id.* (citations omitted).

In *Greenleaf,* we concluded that the district court properly joined the defendants for trial because the defendants did not present "conflicting" defenses. 591 N.W.2d at 499–500. The defendant, Lester Greenleaf, claimed intoxication, duress, and that he was innocent while his codefendant, Andy Leo DeVerney, claimed that he was innocent. *Id.* at 499. In affirming the district court, we concluded that these defenses did not conflict and the jury was not forced to choose between the testimony of the defendants to arrive at the verdicts. *Id. Greenleaf* was decided under the current version of Rule 17.03, subd. 2(1). 591 N.W.2d at 499.

In *DeVerney,* a case involving the same events as in *Greenleaf,* DeVerney argued that the district court erred in joining him and Greenleaf for trial and subsequently erred in denying him severance. 592 N.W.2d at 841. Drawing on *Hathaway,* we concluded in *DeVerney* that the codefendants presented different defenses, but DeVerney did not suffer substantial prejudice because the defenses were not antagonistic. 592 N.W.2d at 842. In support of this conclusion, we stated:

> [S]ubstantial prejudice is not simply whether the defenses presented were different, but whether the defenses were inconsistent, or whether the defendants sought, through their chosen defenses, to shift blame to one another.

*Id.* (citing *Hathaway,* 379 N.W.2d at 503). We observed that neither Greenleaf nor DeVerney sought to shift the blame to the other; rather, both claimed that they did not intend to kill the victim or that they had an excuse for aiding and abetting his

murder. *Id.* As in *Greenleaf,* DeVerney's joinder and severance claims were decided under the current version of subdivision 2(1). 592 N.W.2d at 841–43.

When ruling on Santiago's pretrial motions, the district court did not have the benefit of our decisions in *Greenleaf* and *DeVerney* because we had not yet decided these cases. Nevertheless, in evaluating whether Santiago and Rodriguez presented antagonistic defenses, the court did not look to *Hathaway* for guidance. Instead, in ruling on the January 30 motion, the court took note of a decision of the Louisiana Supreme Court and four federal court decisions. In ruling on the February 19 motion, the court concluded that the 1990 version of Rule 17.03 was modeled on the federal rules and that, under the federal severance standard, Santiago would not be prejudiced by a joint trial.

■ The district court inappropriately used the federal severance standard in analyzing our Rule 17.03, subd. 2(1). *Hathaway* defined antagonistic defenses and stated that the presence of antagonistic defenses constitutes substantial prejudice to a defendant. *See* 379 N.W.2d at 503. Further, in *Greenleaf* and *DeVerney,* we confirmed that *Hathaway's* enunciation of the standard for antagonistic defenses is still the test under the 1990 version of subdivision 2(1). *Greenleaf,* 591 N.W.2d at 499–500; *DeVerney,* 592 N.W.2d at 842. The federal standard is an inappropriate source of guidance when interpreting subdivision 2(1) because the federal standard varies significantly from our rule. Fed. R.Crim.P. 8 carries a presumption in favor of joinder. *Zafiro,* 506 U.S. at 537, 113 S.Ct. 933. Fed.R.Crim.P. 14 grants a court broad discretion on the issue of severance and imposes a heavy burden on the defendant when moving for severance. *United States v. Daniels,* 281 F.3d 168, 177 (5th Cir.2002); *Zafiro,* 506 U.S. at 538–39,

113 S.Ct. 933; *United States v. Lane,* 474 U.S. 438, 449 n. 12, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Minnesota, unlike the federal system, has a historical preference for separate trials and our current version of subdivision 2(1) expresses neutrality on the issue of joinder. Even though the legislature enacted a new severance standard in 1992 that closely mirrors the federal rule, Rule 17.03 has not been amended to conform to the statute. For all these reasons, the district court should not have looked to the federal rules and case law to inform its understanding of our rule. Therefore, we conclude that the court erred when it used the federal standard to reach its conclusion that Santiago's pretrial severance motions should be denied.

Santiago's pretrial severance claims should be evaluated under the substantial prejudice test of subdivision 2(1) as we applied that test in *Hathaway, Greenleaf,* and *DeVerney.* Under this test, a defendant suffers substantial prejudice when he and his codefendant present antagonistic defenses. *See Hathaway,* 379 N.W.2d at 503; *Greenleaf,* 591 N.W.2d at 499-500; *DeVerney,* 592 N.W.2d at 842. Defendants have antagonistic defenses when the defenses are inconsistent and when they seek to put the blame on each other and the jury is forced to choose between the defense theories advocated by the defendants. *See id.*

In evaluating Santiago's February 19 motion, the district court acknowledged that if *Hathaway* provided the standard for antagonistic defenses, then Santiago's severance motion "has a lot of legs." We agree. Santiago's theory of defense for all four pretrial severance motions was that Rodriguez was the shooter and that Rodriguez acted alone. Rodriguez's theory of defense for his pretrial severance motions was that Santiago was the shooter. Applying the standards of *Hathaway,*

*Greenleaf,* and *DeVerney,* we conclude that Santiago and Rodriguez presented antagonistic defenses because Santiago and Rodriguez pointed the finger at each other and each sought to shift the blame for the shooting to the other. This is one of the classic examples of antagonistic defenses we identified in *Hathaway* and *DeVerney.* *Hathaway,* 379 N.W.2d at 503; *DeVerney,* 592 N.W.2d at 842. As set forth below, the record reveals that Santiago presented sufficiently specific evidence that his defense theory was antagonistic to Rodriguez's defense theory. Further, there is no indication on the record that Santiago could not produce the evidence to back up his offer of proof or that there was a want of good faith on the part of Santiago's attorney.

As previously noted, in evaluating whether severance is warranted, a court must consider the nature of the offense charged, the impact on the victim, the potential prejudice to the defendant, and the interests of justice. Minn. R.Crim. P. 17.03, subd. 2(1). Because Santiago and Rodriguez had antagonistic defenses, the potential prejudice to Santiago favored severance. For the same reason, the interests of justice favored severance. Here, the nature of the offense charged and the impact on the victim do not outweigh the considerations of prejudice and the interests of justice; therefore, we conclude that the district court erred when it denied Santiago's pretrial severance motions.

The dissent contends that because Rodriguez's theory of defense was "ever-changing" and "evolving," "the district court cannot be faulted for finding an absence of antagonism between the defense theories of Rodriguez and Santiago." However, the record reveals that Rodriguez's defense theory throughout the pre-

trial stage was that Santiago was the shooter. This theory was presented to and understood by the court. Santiago's memorandum of law in support of his first pretrial severance motion clearly identified his defense theory and identified Rodriguez's defense theory based on Rodriguez's statements to psychological examiners. In its order regarding Santiago's first severance motion, the court had no trouble identifying the respective defense theories of the defendants as follows:

> Defendant Santiago asserts as his defense, through counsel rather than by direct statement, that he never possessed the involved weapon. Defendant Rodriguez, on the other hand, asserts through protected statements made to court-ordered Rule 20 examiners, that he never possessed the involved weapon.

At the hearing on Santiago's second pretrial severance motion, each party identified his respective defense theory to the court. Rodriguez told the court that his defense theory was that Santiago was the shooter. Santiago told the court that his defense theory was that Rodriguez was the shooter and that Rodriguez acted alone. During the evidentiary hearing at which Santiago raised his third pretrial severance motion, Santiago specified that his theory was that Rodriguez acted alone, but

Rodriguez did not specify his theory. However, this motion was made in the context of an evidentiary ruling regarding a witness's testimony that Rodriguez was the shooter. Finally, during the hearing at which Santiago raised his fourth severance motion, Santiago indicated that his theory was that Rodriguez acted alone and Rodriguez indicated that his theory was that Santiago was the shooter. Thus, Rodriguez's defense theory was stable and identifiable throughout the pretrial stage and was not, as the dissent contends, so ephemeral that it was unidentifiable by the district court for purposes of severance analysis.[6]

Because Santiago's offer of proof regarding his defense was sufficient and because the defendants had antagonistic defenses resulting in potential prejudice to Santiago, we hold that the district court erred when it denied Santiago's pretrial severance motions.

### D. Midtrial Severance

Having concluded that the district court erred in denying Santiago's pretrial severance motions, it is not necessary to the disposition of this case to address the district court's rulings on Santiago's midtrial severance motions. However, because the

---

**6.** The dissent also asserts that the pretrial "court concluded that because the defendants were not committed to any particular defense theory, the severance motion should at that time be denied." The dissent contends that this particular finding "is worth our deference." The problem with this assertion is that the court made no such finding. The dissent apparently draws its conclusion that the court made such a finding from the following language in the court's order regarding the first pretrial severance motion:

> Had each of the defendants asserted their respectively claimed defenses in a judicially admissible setting, they might be considered potentially "irreconcilable" for purposes of a severance motion. However, as

presented, they cannot since neither defendant is bound to anything until tactical decisions play out at trial.

It appears that the dissent has confused the identification of the defendants' defense theories with the offer of proof issue. As explained above, the district court was not mystified about what the defense theories were and in fact identified the theories in its order. The court's ruling denying severance is based on its finding that neither party was bound to its defense theory because neither theory was supported by judicially admissible evidence. Because the court made no finding that the defendants were not committed to any particular defense theory, there is no finding worthy of our deference.

district court, the postconviction court, and the court of appeals applied the same standard for evaluating midtrial severance as they did for pretrial severance, we will proceed to examine the standard applied by the district court and whether use of this standard to deny Santiago's midtrial severance motions resulted in an abuse of discretion.

■ Minn. R.Crim. P. 17.03, subd. 3(3), provides:

The court shall sever defendants during trial with the defendant's consent or upon a finding of manifest necessity, if the court determines severance is necessary to achieve a fair determination of the guilt or innocence of one or more of the defendants.

The language of subdivision 3(3) mirrors the language of Rule 472(b)(2)(ii) of the Uniform Rules of Criminal Procedure[7] and ABA Standards 13–3.2(b)(ii).[8] The comments to Rule 17.03, subd. 3(3), confirm that subdivision 3(3) is based on these two model rules. Minn. R.Crim. P. 17.03, subd. 3(3) cmt. Subdivision 3(3) establishes a higher standard for midtrial severance than the pretrial severance articulated in subdivision 2(1).

■ The plain language of subdivision 3(3) indicates that there are two ways to approach a motion for midtrial severance. The first approach uses the fair determination test. The second approach uses the fair determination test coupled with a finding of manifest necessity. The first approach is appropriate when the defendant consents to severance. Under this approach, the court may grant severance with the consent of the defendant, but only if the court determines that severance is necessary to achieve a fair determination of the defendant's guilt or innocence. The second approach is appropriate when the defendant does not consent to severance. In this second situation, not only must severance be necessary to the fair determination of guilt or innocence, but the court must also find that the need for severance rises to the level of manifest necessity.

■ Both approaches to midtrial severance employ the fair determination test. According to the Uniform Rules, the fair determination test requires a court to evaluate the propriety of severance according to whether (1) the trier of fact is able to distinguish the evidence and apply the law intelligently as to each defendant, and (2) the defendants have inconsistent or antagonistic defenses. Unif. R.Crim. P. 472(b)(2)(ii) cmt. In addition, the fair determination test incorporates the constitutional concern for a fair trial. ABA Standards 13–3.1(b) cmt, 13–3.2(b) cmt. Further, we note that the comments to the ABA Standards indicate that the fair determination test is different from Fed. R.Crim.P. 14 because the fair determination test limits judicial discretion, encourages the analytical resolution of severance issues, and establishes the priority of fairness over considerations of expense, efficiency, and convenience. ABA Standards 13–3.1(b) cmt, 13–3.2(b) cmt.

■ Subdivision 3(3) mandates that if a district court determines that sever-

---

7. Rule 472(b)(2)(ii) provides that a court shall sever defendants "during trial, with the defendant's consent to be severed or upon a finding of manifest necessity, if the court determines severance is necessary to achieve a fair determination of the guilt or innocence of one or more of the defendants." Unif. R.Crim. P. 472(b)(2)(ii).

8. Standard 13–3.2(b)(ii) provides that codefendants be severed during trial "whenever, upon consent of the defendant to be severed or upon a finding of manifest necessity, severance is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants." ABA Standards 13–3.2(b)(ii).

ance is necessary to achieve a fair determination of guilt or innocence, the court needs to make a finding of manifest necessity if the defendant does not consent to severance. Minn. R.Crim. P. 17.02, subd. 3(3). The comments to the ABA Standards indicate that the test for manifest necessity embodies the constitutional right against double jeopardy. ABA Standards 13–3.1(b) cmt, 13–3.2(b) cmt. A defendant's double jeopardy right attaches once the jury is sworn. *State v. McDonald,* 298 Minn. 449, 215 N.W.2d 607, 608–09 (1974). Thus, a preverdict termination of the trial as to some or all charges would bar a subsequent trial on the terminated charges unless the defendant has consented to the preverdict termination or unless the preverdict termination is based on manifest necessity. ABA Standards 13–3.1(b) cmt. Manifest necessity normally consists of circumstances that make the continuation of the trial or the prospect of a fair verdict either impossible or highly unlikely. ABA Standards 13–3.1(b) cmt, 13–3.2(b) cmt.

◼ Here, Santiago and Rodriguez both moved for severance, thereby giving their consent. Thus, there was no need for the district court to make a finding of manifest necessity. Instead, the court should have determined whether midtrial severance was necessary to achieve a fair determination of Santiago's guilt or innocence. To make this determination, the court needed to evaluate whether the defendants' defenses were antagonistic such that severance was warranted to achieve a fair determination of Santiago's guilt or innocence.

◼ We first evaluate whether Rodriguez and Santiago presented antagonistic defenses at trial. Throughout the trial, Rodriguez's defense theory was that Santiago directed him to do the shooting and that Rodriguez had limited mental capacity. On the other hand, Santiago's defense

theory throughout was that Rodriguez was the shooter and acted alone. If the jury believed that Santiago directed Rodriguez to do the shooting and provided Rodriguez with the gun, then it could not accept Santiago's defense that Rodriguez acted alone and Santiago did nothing to aid or encourage Rodriguez's actions. If Santiago was not the shooter, the crucial factual issue for determination was whether he was guilty as one who "aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn.Stat. § 609.05. The aiding and abetting charge dovetailed perfectly with Rodriguez's defense that he lacked the requisite intent for second-degree murder because Santiago forced him to shoot. Thus, Rodriguez's defense depended on proof that Santiago aided and abetted the crime, which Santiago sought to disprove. Accordingly, we conclude that the defenses presented at trial were antagonistic.

◼ Having concluded that the defendants' defenses at trial were antagonistic, we proceed to the next step in our application of subdivision 3(3) which is whether severance was necessary to achieve a fair determination of Santiago's guilt or innocence. In essence, Santiago faced two prosecutors at trial—the state and Rodriguez's attorney. Rodriguez's defense theory was virtually the same as the state's theory of Santiago's culpability. The alignment of the state and Rodriguez against Santiago represented an additional twist or ratcheting up of the traditional situation involving antagonistic defenses. Here, both Rodriguez and the state attempted to undermine Santiago's defense.

Rodriguez's alignment with the prosecution was repeated throughout the trial. During its opening statement, the state presented its theory of Santiago's culpability, which was identical to Rodriguez's de-

fense theory. In Rodriguez's opening statement, he further aligned himself with the state by agreeing with the state's opening statement regarding the significance of the testimony of certain disinterested witnesses. During the trial, Rodriguez attempted to rehabilitate some of the state's witnesses following cross-examination by Santiago and used the state's witnesses to support his own defense theory. For example, on direct examination by the state, Webster described the events leading up to the shooting. The state suggested that Webster refer to Santiago as "the director" and Webster did so throughout his testimony. On cross-examination by Santiago, Webster testified that Rodriguez did the shooting and he did not see Santiago hand Rodriguez a gun. Webster also testified that Santiago was an "observer" of events rather than a director. On cross-examination, Rodriguez's attorney used the term "the director" to refer to Santiago. Webster testified that Rodriguez looked scared, Rodriguez was "agitated" by Santiago, and that Rodriguez looked to Santiago for guidance. In light of the prejudice Santiago suffered as a result of facing two prosecutors, we conclude that midtrial severance was warranted to achieve a fair determination of Santiago's guilt or innocence.

The dissent asserts that Rodriguez's defense theory was "ever-changing" and was not identifiable until Rodriguez's closing statement, in which he admitted that he was the shooter. The dissent contends that it was "impossible" for the district court to conclude whether severance was necessary for a fair determination of guilt or innocence. The record, however, does not support the dissent's position. Throughout the trial, there were several clear indicators of the nature and identity of Rodriguez's defense theory, including Rodriguez's reference to the "power structure" between Santiago and Rodriguez in

his opening statement as well as Rodriguez's cross-examination strategy of supporting the testimony of the state's witnesses and undermining the testimony of Santiago's witnesses. For these reasons, we do not agree that it was "impossible" for the district court to evaluate Santiago's midtrial severance motions; rather, Rodriguez's defense theory was identifiable from the record and from the context within which the severance motions were made. Furthermore, Rodriguez's defense theory was the same throughout the trial. In light of the antagonism between the defendants' defense theories and the fact that Santiago essentially faced two prosecutors at trial, we conclude that the district court erred in denying Santiago's midtrial severance motions.

### E. Harmless Error

■ Santiago contends that he is automatically entitled to a new trial if we conclude that the district court erred in denying his severance motions. However, our conclusion that the court erred in denying Santiago's severance motions does not require automatic reversal. The rules of criminal procedure provide that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Minn. R.Crim. P. 31.01. We will not remand a case for a separate trial unless the court's denial of the severance motion was prejudicially erroneous. *State v. Profit*, 591 N.W.2d 451, 460 (Minn. 1999); *State v. DeFoe*, 280 N.W.2d 38, 40 (Minn.1979); *State v. Googins*, 255 N.W.2d 805, 806 (Minn.1977).

■ In applying the harmless error test in the context of severance, we have identified some indicators of prejudice requiring a new trial, including (1) whether, in separate trials of the defendants, the theory of the defense would have been the

same as it was at the joint trial, (2) the likelihood that the results of the joint trial would have been any different from a separate trial of defendants, and (3) whether evidence that would otherwise be inadmissible became admissible because of the joinder. *DeFoe,* 280 N.W.2d at 40; *State v. Knight,* 260 N.W.2d 186, 187; *State v. Musta,* 284 Minn. 359, 364, 170 N.W.2d 341, 345 (1969). The U.S. Supreme Court has defined the harmless error standard of Fed.R.Crim.P. 52(a), upon which our Rule 31.01 is based,[9] in the context of misjoinder. The Supreme Court has stated that the ultimate question is whether misjoinder "results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Lane,* 474 U.S. at 449, 106 S.Ct. 725 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The Supreme Court has also said:

> The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* (quoting *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239).

 Unfortunately, neither party has addressed the harmless error issue. Thus, the burden of proving that failure to sever constitutes or does not constitute harmless error has not been addressed, much less satisfied. Therefore, we remand this case to the district court for consideration of whether that court's failure to grant Santiago's severance motions constitutes harmless error.

We conclude that a remand is particularly appropriate when, as here, we have articulated the meaning of a recently-re-

vised rule of criminal procedure and our articulation differs substantially from that applied by the lower courts. In this situation, the interests of fairness support giving the parties the opportunity to apply in the first instance our harmless error test in the context of the severance of these two defendants. The parties themselves are in the best position to identify the extent to which the joint trial was prejudicially erroneous. For example, one indicator of prejudice is whether the defense theories of the defendants would have differed had there been separate trials. Rather than speculating as to what those theories would have been had there been separate trials, we remand to permit the parties to address the issue. A second indicator of prejudice is whether evidence that was excluded from the joint trial might be admissible in separate trials. The parties can evaluate this on remand. Further, on remand, the parties can address the extent to which the existence of a second prosecutor was prejudicially erroneous. Finally, assuming without deciding that the state has the burden of proving harmless error, interests of fairness militate against our deciding the issue without giving the state the opportunity to address the issue.

## II.

The second issue before us is whether the district court abused its discretion in excluding three pieces of evidence. The three pieces of evidence excluded are (1) evidence that Rodriguez was known to carry handguns in his waistband, offered to show that Rodriguez might have had a gun when he arrived at the pool, (2) evidence that Rodriguez was known to have a volatile temper, offered to show who did the shooting, and (3) evidence that a pair of shoes found in a duffel bag in the Chevro-

---

9. Minn. R.Crim. P. 31.01 cmt. (stating that rule 31.01 is based on Fed.R.Crim.P. 52(a)).

let fit Rodriguez and not Santiago, offered to rebut the assertion that no evidence connected either defendant to the clothing found in the getaway car. The first piece of evidence was excluded unless Santiago made an acceptable offer of proof and established sufficient foundation for the evidence. The second piece of evidence was excluded as irrelevant, highly prejudicial, and of low probative value. The third piece of evidence was excluded because the evidence was not relevant and because the earlier assertion was that there were no identifying marks on the clothing.

Because we have remanded this case for consideration of whether the failure to sever Santiago and Rodriguez for trial was harmless error, and because resolution of Santiago's severance claim may be dispositive of this case, it is not required that we address Santiago's evidentiary claims at this time.

Reversed and remanded for proceedings consistent with this opinion.

STRINGER, Justice (dissenting).

I respectfully dissent. Rodriguez's defense in this case was an ever-changing, evolving theory that began as a nonspecific allegation that Santiago was the shooter and culminated in Rodriguez's closing-argument admission to being the shooter. As such, the district court cannot be faulted for finding an absence of antagonism between the defense theories of Rodriguez and Santiago. It is only through the use of hindsight, relying on what Rodriguez's defense evolved into rather than what it was when the district court ruled on the severance motions, that this court can conclude that the district court erred in failing to sever trials in this case. In addition, even after defense theories became absolute during closing arguments, because jurors could rationally believe both defense theories, they were not so antagonistic that severance was required.

I agree with the court that the joinder standards in subdivision 2(1) may also be considered to apply to pretrial motions to sever. Minn. R.Crim. P. 17.03, subd. 2(1) permits the court to join defendants for trial upon the consideration of four factors: the nature of the offense charged, the impact on the victim, the potential prejudice, and the interests of justice. While Santiago and the court focus on whether there was potential prejudice, no one factor is determinative, and therefore our inquiry should include all of the considerations the district court had before it.

Before trial began Santiago argued that his defense and the defense of Rodriguez were mutually antagonistic because each defendant sought to blame the other for the shootings. Santiago contended that in a psychiatric evaluation ordered pursuant to Minn. R.Crim. P. 20.01 and 20.02, Rodriguez made a statement denying that he shot the victims and accusing Santiago of starting the argument and shooting the victims. Counsel for Santiago also asserted by affidavit that security concerns had been raised by threats directed against family members Santiago intended to produce as witnesses to testify that the murder weapon belonged to Rodriguez.

The pretrial court addressed the security concerns first, concluding that the sheriff's department could deal with the security issue. The court then concluded that because the defendants were not committed to any particular defense theory, the severance motion should at that time be denied.

I would hold that, while we make an independent inquiry whether severance was necessary under Rule 17.03,[1] the par-

---

1. *State v. Hathaway,* 379 N.W.2d 498, 502 (Minn.1985).

ticular finding of the district court that the parties had not committed to any specific defense theory is worth our deference. The district court is in a much better position than an appellate court to have a sense of the expected testimony, its significance, and the defense strategy at any given point in time. Indeed, in its analysis the majority ignores that a district court must examine a pretrial motion to sever based on the defense theories articulated *at that point in time—pretrial.* The district court could not have known pretrial that Rodriguez would ultimately admit. to being the shooter and that his defense theory would dovetail with the state's theory. Instead, assessing the theories at the time the pretrial severance motion was made, the district court concluded that because the defendants were not committed to a defense theory, pretrial severance was not warranted.

Moreover, the record fully supports the district court's conclusion on pretrial severance. Several witnesses testified the two defendants acted in close consort with one another. Because the codefendants were cousins, family members found it difficult to testify. Testifying and hearing testimony about the shootings was very difficult for witnesses and the victims, and some witnesses appeared to the district court to be afraid or reluctant to testify. Therefore, the nature of the offense and the impact on the victims weighed against pretrial severance. *See* Minn. R.Crim. P. 17.03, subd. 2(1). In addition, given the security concerns of witnesses at the trial, the interests of justice weighed against severance. *See id.*

Further, at a pretrial hearing Rodriguez's attorney represented to the court that his defense would be that Santiago was the shooter and that the shooting was gang-related. Because the court ruled that evidence of gang affiliations was not admissible, however, it was not clear that Rodriguez would pursue this theory. Nonetheless, the majority asserts that Rodriguez's theory of defense for all pretrial severance motions was the same—that Santiago was the shooter. Based on the record before the district court and the changing nature of Rodriguez's defense, I believe the court properly determined that any potential prejudice from joinder remained unclear before trial.

I therefore conclude that of the four factors to be considered for pretrial severance under Rule 17.03, subd. 2(1), three weighed against severance and the fourth, potential prejudice, was simply too uncertain given the lack of clarity of Rodriguez's defense theory.

With respect to mid-trial severance, even after opening statements it remained unclear what Rodriguez's defense would be, making it impossible for the district court to conclude that severance was necessary for a fair determination of guilt or innocence under Minn. R.Crim. P. 17.03, subd. 3(3). In his opening statement, Rodriguez's attorney stated very little: that Rodriguez was 19 years old, had no criminal record, and was "as dumb as they come." Although counsel argued that the "power structure" between the codefendants would become clear to the jury, Rodriguez did not admit at that time to being the shooter or claim that Santiago egged him on. The state then presented evidence indicating that Santiago gave Rodriguez the gun and told him to shoot. Santiago sought to prove through cross-examination and his own witnesses that Rodriguez acted alone. It was only at closing argument however that Rodriguez admitted, through counsel, to being the shooter. Rodriguez's counsel argued that Santiago. gave Rodriguez the gun. His counsel then argued, not that Rodriguez was not the shooter, but rather that he

did not have the intent necessary for a second-degree murder conviction and that he should be convicted of heat of passion manslaughter or third-degree murder (eminently dangerous act evincing a depraved mind). He referred extensively to the testimony of witnesses who described Rodriguez as "askew," "out of it," "gone," or "not focusing" to attempt to persuade the jury that even though Rodriguez was the shooter, he was not guilty of intentional second-degree murder. Thus, Rodriguez's trial theory evolved from a pretrial representation that Santiago was the shooter, to an uncertain position in his opening statement, to admitting he was the shooter at closing argument but claiming that his mental state was "out of it." Given the lack of clarity of Rodriguez's defense, it is difficult to assess, much less conclude, that the two defense theories prevented a fair determination of guilt.

Santiago claims a fair determination of guilt was not possible because he and Rodriguez blamed each other for the shooting. It is not necessarily the case, however, that blame shifting between codefendants prevents a fair determination of guilt or innocence. Several federal decisions address the considerations attendant to blame shifting. Although these decisions apply the federal rule for severance,[2] which favors joint trials, the analysis is helpful to the extent it bears upon whether the defendant can receive a fair determination of guilt or innocence.

In *Zafiro v. United States*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), the defendant claimed he was entitled to a separate trial under Fed.R.Crim.P. 14 because his and his codefendant's defenses were "mutually antagonistic." The Supreme Court explicitly declined to adopt a bright-line test mandating severance whenever codefendants present mutually antagonistic defenses stating:

> Mutually antagonistic defenses are not prejudicial *per se.* * * * We believe that, when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.

*Zafiro*, 506 U.S. at 538–39, 113 S.Ct. 933.[3] This two-part analytic framework for determining what constitutes substantial prejudice requiring severance broadly takes into account the right of a defendant to advance his trial rights without compromise because of joinder, and where trials have been joined, to consider the burden on the jury in arriving at a reliable judgment of guilt of innocence. I would add however, that where the theories of defense of each of the accused are so totally irreconcilable that the codefendant becomes a "second prosecutor," where proof

**2.** Fed.R.Crim.P. 8 allows joinder when two or more defendants are alleged to have participated in the same act or transaction. Fed.R.Crim.P. 14 provides simply, "If it appears that a defendant * * * is prejudiced by a joinder of offenses or of defendants * * * for trial together, the court may order an election or separate trials of counts [or] grant a severance of defendants * * *."

**3.** Justice Stevens concurred, noting that he did not share his colleagues' enthusiasm for joinder because in joint trials where the code-

fendants present truly irreconcilable or mutually exclusive defenses, the burden on the prosecutor may be reduced in at least two ways—a codefendant may in effect become a second prosecutor, or the jury, confronted with two defendants, one of whom is almost certainly guilty, may convict the one more culpable even though guilt is not proven beyond a reasonable doubt. *Zafiro*, 506 U.S. at 543–44, 113 S.Ct. 933 (Stevens, J., concurring).

of guilt beyond a reasonable doubt may be compromised by the inability of the jury to compartmentalize the evidence as to each defendant, or where the verdict is based upon the comparative culpability of each defendant rather than the guilt of each beyond a reasonable doubt, then a trial right of the defendant might well have been denied by failure to sever.[4] But these factors are not present here.

In this case the record demonstrates that while the defenses advanced by Santiago and Rodriguez were somewhat antagonistic, they were not so antagonistic that the jury could not make a fair determination of guilt or innocence. In moving to sever, Santiago alleged that Rodriguez would claim, as he did in a Rule 20 evaluation, that Santiago was the shooter. Despite the ever-changing defense theories, in the end it was possible for the jury to believe both Rodriguez and Santiago. Specifically, the jury could have believed Santiago's theory that he was not the shooter, did not egg Rodriguez on, and did not provide Rodriguez the gun.[5] At the same time, the jury could also have believed that Rodriguez was the shooter but was "out of it," and therefore lacked the mental state to be guilty of second-degree murder. Or the jury could do just what it

did—disbelieve Santiago and Rodriguez and convict both of second-degree murder. Thus, when the evidence clearly showed that Rodriguez was the shooter, and he admitted as much, his conviction of either second-degree murder or manslaughter was a foregone conclusion—regardless of whether the jury believed or did not believe Santiago. Under these circumstances the defense theories of Santiago and Rodriguez were not so antagonistic that a fair determination of guilt or innocence was not possible and any prejudice to Santiago was not significant.

Moreover, the trial process itself did not pit Santiago against Rodriguez. The defendants frequently joined each other in opposition to the state and were not consistently at odds with each other's trial tactics. For example, the defendants jointly moved to strike the entire jury pool and to compel discovery of a witness's involvement as a witness in a concurrent action. For different reasons, each objected to the prosecution's voir dire of the jury pool. While they sparred over the admission of evidence of Santiago's prior convictions and connections to gang activity, the trial court denied all motions to introduce the evidence. Further, neither defendant

---

4. The response of the federal circuit courts to *Zafiro* has been mixed. Before *Zafiro*, the federal circuit courts consistently required irreconcilable or mutually exclusive defenses before antagonism between codefendants would warrant severance. *See generally, United States v. Zafiro,* 945 F.2d 881, 885 (7th Cir.1991) (explaining that the formulation that mutually exclusive and irreconcilable defenses warrant severance, but mere finger pointing does not, "has become canonical."). After *Zafiro*, some circuit courts have suggested that the rule of mutually exclusive and irreconcilable defenses may constitute insufficient antagonism under *Zafiro, see United States v. Balter,* 91 F.3d 427, 433 (3d Cir. 1996); *United States v. Breinig,* 70 F.3d 850,

853 (6th Cir.1995); *United States v. Harwood,* 998 F.2d 91, 95 (2d Cir.1993), while other circuit courts, including the Eighth and Ninth, have concluded that the "irreconcilable" rule comports with *Zafiro* as part of determining whether joinder might impair a jury's capacity to make a reasonable determination of guilt or innocence in a joint trial, *see United States v. Mayfield,* 189 F.3d 895, 899–900 (9th Cir.1999); *United States v. Shivers,* 66 F.3d 938, 940 (8th Cir.1995).

5. The postconviction court noted, "Rodriguez's theory did not address whether Petitioner gave him the gun or whether he carried it all along."

consistently joined or opposed the other's motions.[6]

As to the ability of the jury to compartmentalize the evidence relating to each defendant, I agree with the postconviction court when it noted that the facts were simple and a joint trial provided the fairest assessment of what happened. There was virtually no evidence presented that was not relevant to the guilt or innocence of both parties, and it clearly appears that if a separate trial were ordered for Santiago, the evidence presented by the state and the defense would be no different. Any potential confusion was sufficiently cured by the trial court's admonition to the jury to keep the evidence separate as to each defendant.[7]

Santiago also contends that he suffered prejudice because he was precluded from introducing exculpatory evidence from Blanchard Griffin who was sitting in Webster's van during the shootings and allegedly would have testified that Rodriguez did the shooting and that prior to the shooting Griffin did not see the transfer of anything from Santiago to Rodriguez. While the inability to present exculpatory evidence could deny a defendant the con-

stitutional right to make a complete defense, *State v. Voorhees*, 596 N.W.2d 241, 249 (Minn.1999),[8] that did not happen here. Rodriguez objected to Griffin's testimony as to the identification of photographs of both defendants, arguing that Griffin's identifications were tainted because a police officer made suggestive comments during the photographic identification. The state conceded the point and the evidence was not admitted. The court's decision to exclude Griffin's photographic identification however, did not preclude Santiago from calling Griffin as a witness to testify as to what he saw that day at Hampton Place Apartments. Santiago declined to take the opportunity to put Griffin on the witness stand, so the record hardly presents a circumstance of the suppression of "essential exculpatory evidence" referenced in *Zafiro*.

Based upon the record before us, I cannot conclude that Santiago demonstrated that the antagonistic defenses precluded a fair determination of guilt or innocence under Rule 17.03, subdivision 3(3), or that, without the aid of hindsight, pretrial severance was required under the four factors

**6.** For example, at one point Santiago raised sixteen pretrial motions on the admissibility of evidence and of those Rodriguez appears to have opposed six, joined three and remained neutral on four. On the same day Rodriguez raised nine motions and of those Santiago objected to four.

**7.** The jury was instructed:

A separate crime is alleged against each defendant in each count of the complaint. Each alleged offense and any evidence pertaining to it should be considered separately by the jury. You must separate—you must give separate and individual consideration to each charge against each defendant. It is your duty to give separate and personal consideration to the case of each individual defendant.

When you do so, you should analyze what the evidence in the case shows with respect

to that individual defendant leaving out of consideration entirely any evidence admitted solely against the other defendant. Each defendant is entitled to have his case determined from evidence as to his own acts, statements and conduct and any other evidence in the case which may be applicable to him.

The fact that you return a verdict of guilty or not guilty to one defendant should not in any way affect your verdict regarding any other defendant. Unless specifically directed otherwise, you must consider each instruction given to apply separately and individually to each defendant on trial in this case.

**8.** *See also Zafiro*, 506 U.S. at 539, 113 S.Ct. 933 ("[A] defendant might suffer prejudice if *essential* exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial.") (emphasis added).

in Rule 17.03, subdivision 2(1). I would affirm Santiago's conviction.

RUSSELL A. ANDERSON, Justice (dissenting).

I join in the dissent of Justice Stringer.

LANCASTER, Justice (dissenting).

I join in the dissent of Justice Stringer.