STATE of Minnesota, Respondent,

v.

Vernon Neal POWERS, Appellant.

No. C3–01–1478.

Supreme Court of Minnesota.

Jan. 2, 2003.

Melissa Victoria Sheridan, # 180269, Assistant Public Defender, St. Paul, MN, for Appellant.

Mike Hatch, Minnesota State Attorney General, Thomas R. Ragatz, # 236822, Assistant Attorney General, St. Paul, MN, Patrick A. Oman, Mower County Attorney, Austin, MN, for Respondent.

## OPINION

GILBERT, Justice.

Appellant, Vernon Powers, was convicted of two counts of first-degree premeditated murder in violation of Minn.Stat. § 609.185(1) (2000), two counts of second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2002), two counts of first-degree felony murder in violation of Minn.Stat. § 609.185(3) (2000), two counts of second-degree felony murder in violation of Minn.Stat. § 609.19, subd.

2(1) (2002), one count of first-degree assault in violation of Minn.Stat. § 609.221, subd. 1 (2002), and one count of possession of a pistol by a felon in violation of Minn. Stat. § 624.713, subd. 1(b) (2002). Appellant, in this direct appeal, asks for review on the following grounds: 1) the district court erred by joining appellant with codefendants for trial and by not issuing a midtrial severance; 2) the district court abused its discretion by not hearing all relevant evidence in a *Schwartz* hearing into improper contact between a prosecutor and a juror; 3) the prosecutor engaged in prejudicial misconduct during his opening statement and closing argument; 4) the district court erred by conducting several hearings during trial without appellant present; 5) appellant received ineffective assistance of counsel; and 6) selecting a jury with codefendants denied appellant's right to an impartial jury and adequate voir dire. We affirm.

Juan Ramirez, his 14–year–old nephew, Jorge Ramirez, Raul Gutierrez, Arturo Caballaro–Duran and Benjamin Moreno–Hernandez, all of whom were in town working as roofers, were staying in room 28 of the Downtown Motel in Austin, Minnesota. In the early morning hours of June 30, 2000, a woman knocked on the door of their hotel room. Raul Gutierrez opened the door and the woman entered the room, followed by two men who were both holding guns. The men demanded money from those inside the hotel room. One man stood by the doorway while the other stood by the nightstand. The man by the nightstand came over to the man by the doorway and said, "shoot him, shoot him." The man standing by the door then started shooting. Juan Ramirez and Raul Gutierrez were both shot numerous times and died as a result of their wounds. Benjamin Moreno–Hernandez was shot too, but his injuries were not fatal.

Appellant and three others were indicted for the murders and assault in room 28. Janea Weinand, one of the four indicted for these crimes, pleaded guilty to two counts of second-degree intentional murder and one count of first-degree assault. Her plea agreement was contingent on her testifying in the trial of the other three defendants, which she did. Appellant, Scot Christian and David Christian were joined for trial pursuant to Minn. R.Crim. P. 17.03, subd. 2(1). A joint jury trial was held and appellant was found guilty on all ten counts. A summary of the evidence brought forth at trial follows.

A Bureau of Criminal Apprehension (BCA) team investigating the crime scene found a Halloween mask underneath the body of Juan Ramirez. A forensic scientist from the BCA testified at trial that the predominant profile of the DNA found on the inside of the mask matched that of appellant, and that the probability of selecting "an unrelated individual at random from the general population that would have had that same profile is one in 700 trillion." The same BCA scientist examined a shoe left at the crime scene and testified that the predominant DNA profile present in the shoe was that of the appellant; and that the probability of an unrelated person at random having the "same profile is one in 20 billion."

At the time of the murders, appellant was in Austin and had been staying in the Downtown Motel along with Scot Christian, Janea Weinand, Janet Hall, and Tanisha Patterson. Shortly before the murders, David Christian and Natasha Munos joined the others at the Downtown Motel. Weinand testified at trial that on June 29, 2000, while receiving payment for prostitution, she noticed that Juan Ramirez was carrying a large amount of cash in a red bandana. Weinand then testified that she told Hall and Patterson that Scot Christian

and appellant should be informed about the man with the money so they could rob him. Weinand also testified that later that evening appellant, Scot Christian, David Christian, Patterson and Hall discussed the plan for the robbery. Weinand testified that immediately before leaving the hotel room she, appellant, Scot Christian and David Christian discussed the robbery while two guns, two masks, some nylons and handcuffs lay on the bed. According to Weinand, in the early morning hours of June 30, 2000, the group, having packed their belongings into the appellant's Dodge Durango, got in, and David Christian backed the truck into a spot near room 28. Weinand exited the truck and knocked on the door of room 26. Appellant and Scot Christian stood facing Weinand while she knocked. When there was no response, she realized she had the wrong room and moved on to room 28. Appellant was wearing a "Scream mask," and Scot Christian was wearing the "mask of a bald headed white guy." Raul Gutierrez opened the door and Weinand entered, followed by Scot Christian and appellant.

Appellant testified at trial that he was in room 28 with Weinand and Scot Christian the night of the murders but was unaware of any plan to rob the men inside. Appellant testified that once inside the room, Scot Christian turned to him and Weinand and asked, "Who owes the money?" Immediately thereafter, a scuffle broke out and a Mexican man yelled, "Shoot 'em. Shoot 'em." Appellant went on to claim that a shot rang out from the direction of the room where Scot Christian and occupants of the motel room were standing. Appellant ducked down, his hands touching the ground. He then heard shots coming from directly behind him. Appellant turned around and saw Weinand head toward the Durango. A few seconds later, appellant spun around to leave the room; stumbled and lost his shoe in the process.

Appellant admitted the mask found in the motel room was his, but denied having brought it to the motel room that night.

Appellant's version of the facts that night is contradicted by the testimony of his companions and the testimony of those inside room 28. Janea Weinand and Tanisha Patterson both testified that appellant was party to the planning of the robbery. Weinand testified appellant was in the motel room when the guns, masks and nylons were lying on the bed. Jorge Ramirez testified that two men came into the room carrying guns and identified appellant as the man standing next to the door who first fired his weapon. Benjamin Moreno–Hernandez testified that two men entered the room demanding money and that each had a gun. Arturo Caballaro–Duran also testified that two men came into the room pointing guns. Natasha Munos testified that Weinand returned before appellant and Scot Christian, that the shooting started after Weinand had returned to the Durango and she saw appellant stumble out of the motel room shooting. Janet Hall also testified that Weinand returned to the truck before the shooting started and appellant and Scot Christian returned later.

Once appellant and Scot Christian returned, David Christian drove the group out of town. Hall testified that she saw appellant and Scot Christian throw a wallet and a jacket out the window as the Durango left Austin. Weinand and Munos also both testified that a jacket was thrown out the window. On Friday morning, June 30, 2000, the group arrived back in St. Paul. Appellant, Scot and David Christian, Tanisha Patterson and Natasha Munos stayed at Weinand's house. Weinand testified that while at the house she, appellant, Scot Christian, Munos and Patterson discussed leaving town and that Scot Christian, Patterson and Munos left the house to obtain fake identification to facili-

tate travel out of the state. Patterson and Munos corroborated that fact; both testified that they left the house to get fake identification. Weinand also testified that at around 5:00 or 6:00 p.m. appellant became concerned that the police had picked up the members of the group who had left to get fake identification. Either appellant or David Christian took two guns from under the couch. The guns were then wrapped in a beach towel and placed in appellant's Oldsmobile Bravada parked outside. Appellant then directed Weinand to park the vehicle somewhere else so the police, if they came, would not be able to find the guns.

That evening, appellant's girlfriend called and notified him that the license plate number from his truck was on the news. Appellant then decided that they needed to come up with a story to tell the police. He called Janet Hall and a story was concocted. Weinand called her mother and was instructed by appellant to leave a message describing where the Bravada was parked, informing her mother that the keys would be in the apartment, and instructing her to clean up the truck. Later that same day appellant and David Christian were arrested outside of Weinand's apartment. Weinand's mother, Linda Thomas, testified at trial that she did begin to clean out the Bravada pursuant to the instructions she had received. She found two guns and put them in a bag. She then took the vehicle to Minneapolis and sold it to a drug dealer for $40 to prevent it from being connected to her or her daughter. After talking to her lawyer, she turned the two guns over to the police.

## I.

Appellant argues joinder was inappropriate in this case, that the district court committed reversible error by joining appellant for trial with codefendants Scot and David Christian, and that the subsequent failure to sever appellant's case midtrial was reversible error.

■ The district court, in its December 28, 2000 omnibus order, joined for trial the cases of appellant, Scot Christian, and David Christian. In making this decision the district court looked to Minn. R.Crim. P. 17.03, subd. 2(1). Appellant contends that although the district court appropriately relied on Minn. R.Crim. P. 17.03, subd. 2(1) as the standard for whether a joint trial is appropriate, the facts in this case did not support joinder. This court reviews district court rulings on joinder of defendants by making, "an independent inquiry into any substantial prejudice to defendants that may have resulted from their being joined for trial." *State v. DeVerney*, 592 N.W.2d 837, 841 (Minn.1999) (quoting *State v. Hathaway*, 379 N.W.2d 498, 502 (Minn.1985)). Minnesota Rules of Criminal Procedure 17.03, subd. 2(1) states:

When two or more defendants are jointly charged with a felony, they may be tried separately or jointly in the discretion of the court. In making its determination on whether to order joinder or separate trials, the court shall consider the nature of the offense charged, the impact on the victim, the potential prejudice to the defendant, and the interests of justice.

■ We will address each of the four factors in turn. The district court found that the nature of the offense charged favored joinder. We agree. Joinder is appropriate when codefendants act in close concert with one another. *DeVerney*, 592 N.W.2d at 842. In this case, the appellant, Scot Christian and David Christian each played a role in a joint scheme to perpetrate an aggravated robbery. The codefendants each were involved in discussions to plan the crime, each had a role in the

scheme, two possessed loaded pistols that were used in the robbery and all worked together to accomplish a criminal objective. They fled the scene of the crime together and once back in the metro area, together endeavored to hide evidence and fashion a plan to avoid prosecution by leaving the state.

■ The next factor to be considered is impact on the victim. The district court found that multiple trials would have some negative impact on the surviving shooting victim and that other eyewitnesses to the shootings would be traumatized if compelled to testify to the same facts on numerous occasions. Based on our independent review of the record, the violent nature of the crime charged, the number of people involved, and the actions of appellant and codefendants to avoid apprehension immediately following the crime, we conclude that the factor of victim impact favored joinder.

■ We now move to a discussion of potentially antagonistic defenses. The district court found that none of the defendants had shown or identified any potentially antagonistic or inconsistent defenses to be asserted at trial, relying on *Santiago v. State*, 617 N.W.2d 632 (Minn.App.2000). Subsequently, this court reversed the court of appeals and held that the district court erred by not granting the defendant's pretrial motion for severance. *Santiago v. State*, 644 N.W.2d 425, 447 (Minn. 2002). We stated that "Santiago presented sufficiently specific evidence that his defense theory was antagonistic to [codefendant's] defense theory." *Id.* at 446. In *Santiago*, the two defendants pointed the finger at each other and sought to shift blame for the shooting to the other. *Id.* at 446. However, in the case before us, there was not sufficient evidence that antagonistic defenses existed. At the November 3, 2000 pretrial hearing addressing the issue of joinder, appellant's counsel argued that as family, Scot and David Christian and their half sister, Janet Hall, would be inclined to point the finger at the appellant, while admitting these individuals had said nothing to support that theory.

■ General concern on the behalf of defense counsel that familial bonds will work against his client is not adequate to demonstrate the existence of inconsistent or antagonistic defenses. Absent an offer of proof or the identification of any inconsistent or antagonistic defenses by the appellant, there was no indication that joinder would substantially prejudice his trial. We conclude that based on the failure to show the existence of antagonistic defenses, joinder did not create the potential for prejudice to the appellant. Furthermore, the district court commented in its order about its ability to address any potential prejudice that may arise at the trial with the power to sever pursuant to Minn. R.Crim. P. 17.03, subd. 3(3).

■ The district court found that the interests of justice also weighed in favor of granting the state's motion to join the trials of appellant, Scot Christian and David Christian. That decision was based on the belief that separate trials would drag on for a long time and could prejudice potential jurors through the publicity related to each trial. The district court also found that separate trials would create difficulty because several potential witnesses were foreign nationals, and because Bureau of Criminal Apprehension personnel would have to travel from St. Paul to Austin.

Appellant claims that the subsequent change of venue from Mower County to Dakota County eliminated the problem of travel for the witnesses from the BCA. While this is true, the other factors cited

by the district court in support of joinder remained even after the change of venue.

■ Appellant also asserts that the primary justice interest in this case should be providing a fair trial for each defendant. Under Minnesota law, however, there is no presumption that a joint trial will deny the defendant the right to a fair trial. *See Santiago*, 644 N.W.2d at 446. Indeed, that determination has been left to the sound discretion of the district court. *See* Minn. R.Crim. P. 17.03, subd. 2(1). The interests of justice are one of four factors to be considered by the district court when determining whether a joint trial would be a fair trial. Arguing that a joint trial itself is against the interest of justice is flawed. A defendant should demonstrate how the interests of justice are affected in a joint trial such that joinder would result in the denial of a fair trial. We conclude that all four factors found in Minn. R.Crim. P. 17.03 favored joinder and, therefore, appellant did not suffer substantial prejudice by being joined for trial. Accordingly, we affirm the district court ruling to join for trial appellant and codefendants Scot Christian and David Christian.

Next, we address the question of midtrial severance. The standard for midtrial severance is set out in Minn. R.Crim. P. 17.03, subd. 3(3), which states:

> The court shall sever defendants during trial with the defendant's consent or upon a finding of manifest necessity, if the court determines severance is necessary to achieve a fair determination of the guilt or innocence of one or more of the defendants.

■ The defendant made two midtrial motions for severance, both during jury selection. The first came in response to a codefendant striking a juror whom appellant found acceptable. The second was made when codefendant Scot Christian requested the right to proceed pro se. In his arguments to this court on severance, appellant does not rely on these motions. Issues not addressed by a party's brief are considered waived, and we will not address those two motions here. *See Scruggs v. State*, 484 N.W.2d 21, 27 n. 1 (Minn.1992).

■ Although no further motions for midtrial severance were made, appellant now argues that on cross-examination of some of the witnesses, Scot Christian's attorney pointed to appellant as the shooter while David Christian's attorney's cross-examination of some witnesses depicted appellant as the ring leader, citing both as evidence of antagonistic defenses. The standard for midtrial severance is higher than that for pretrial severance. *Santiago*, 644 N.W.2d at 448. Thus, when antagonistic defenses arise during the course of trial the judge may sever, either in response to a party's motion or sua sponte, only if the fair determination test has been met. *See* Minn. R.Crim. P. 17.03, subd. 3(3). Because appellant did not move for midtrial severance when these incidents occurred, this court will only review the trial court's application of the fair determination test if there was "(1) error; (2) that is plain; and (3) the error must affect substantial rights." *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998) (citing *Johnson v. United States*, 520 U.S. 461, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)); Minn. R.Crim. P. 31.02. Further, even if the error meets all three criteria, this court will decide if it must be addressed to "ensure fairness and the integrity of the judicial proceedings." *Griller*, 583 N.W.2d at 740.

■ The fair determination test required under Minn. R.Crim. P. 17.03, subd. 3(3) has two parts: "whether (1) the trier of fact is able to distinguish the evidence and apply the law intelligently as to each defendant, and (2) [whether] the defen-

dants have inconsistent or antagonistic defenses." *Santiago,* 644 N.W.2d at 448. The judge instructed the jury to consider the evidence against each defendant separately. There is no reason to believe the jury would be unable to intelligently apply the law to each defendant. Therefore, our analysis will focus on part two of the two-part test. As in *Santiago,* we must determine whether severance was required for the fact finder to reach a fair determination of appellant's guilt or innocence. *See id.* at 449. In *Santiago,* we were presented with a case where each defendant attempted to depict the other as the shooter and numerous motions for midtrial severance were made. *Id.* at 434–36, 449. Here, we must first examine the defense theories of all three codefendants and determine if it was error for the district court to fail to sua sponte order a midtrial severance, when none of the three codefendants made such a request on his own behalf.

Appellant correctly points out that at times in their respective cross-examinations of the state's witnesses, the attorneys for the Christian brothers did ask questions highlighting appellant's role in the aggravated robbery and murder. Questions relating to threats, cover up, disposing of evidence and prostitution were posed to two of the state's 23 witnesses, by codefendant's counsel. However, when considered in light of the overwhelming evidence of a joint and common robbery scheme, these questions did not present prejudicial antagonistic defense issues, as in *Santiago.* This is especially true where there was evidence of two shooters and two guns and the questioning in issue was not exculpatory as to any of the defendants but merely clarified the roles played by each of the participants in this joint crime.

Appellant also points to a question from a codefendant's attorney's cross-examination of Munos, which clarified that she had witnessed appellant shooting. This question merely sought to clarify what was already in the record and was not sufficiently prejudicial to demonstrate the existence of antagonistic defenses. The record demonstrated there were two individuals who fired the shots in question. It is clear from a thorough review of the entire record that the instances cited by the appellant as proof of the existence of antagonistic defenses were at most clarifications elicited in the context of what were otherwise consistent and collaborative defenses.

Clear evidence of the lack of antagonistic defenses can be found in the passive manner in which each codefendant cross-examined appellant and the content of each codefendant's closing argument. On cross-examination, neither of the codefendants' counsel attempted to undermine any of appellant's testimony. Indeed, each looked to appellant to bolster his own case and present exculpatory evidence, which appellant attempted to provide. In closing argument as well, all three codefendants attempted to cast doubt on the testimony of the state's witnesses, and did not attempt to shift blame from one defendant to another. The lack of an antagonistic cross-examination of appellant by his codefendants, the absence of any motion for midtrial severance after jury selection by any of the codefendants, and the presentation of compatible closing arguments, clearly demonstrate that the theories of defense were not antagonistic. Having concluded that the defenses presented at trial by Scot Christian, David Christian and appellant were not antagonistic, we conclude that the district court did not err by failing to sua sponte sever appellant's case midtrial.

## II.

Appellant contends that the district court abused its discretion by refusing to hear all the relevant evidence to determine if a private communication between the prosecutor and a juror improperly influenced the juror. Late in the trial, counsel for appellant relayed to the judge a report from a friend of appellant that there had been improper contact between a prosecutor and a juror at a local restaurant during lunch. According to appellant's counsel, the witness to the exchange heard the prosecutor say, "we are about to blow it up" or "it's about to blow up" and the juror responded by mumbling something or laughing. The prosecutor upon hearing the allegation claimed that he had said, "done soon" or "should be done soon." The judge decided not to hear from the witness to the interaction, and instead opted to only conduct an unsworn examination of the juror involved, believing this was the appropriate manner in which to conduct a *Schwartz* hearing.[1] When questioned, the juror told the court that, in passing, the prosecutor had said, "It's winding down" and did not believe that the few seconds long interaction was an attempt to influence him.

This court has found, "that the manner in which a Schwartz hearing is conducted rests within the sound discretion of the trial court." *State v. Olkon*, 299 N.W.2d 89, 109 (Minn.1980). We conclude that the judge did not abuse his discretion by limiting the examination to the juror involved. It was also proper for the judge to accept as an offer of proof defense counsel's assertion of what the witness to the interaction had told him. There was no objection at trial as to the manner in which the *Schwartz* hearing was conducted. Having taken notice of the substance of the alleged improper influence, an examination of the juror was sufficient to find that the contact, beyond a reasonable doubt, would not contribute to the jury's verdict.

## III.

Appellant claims that the prosecutor deprived him of his right to a fair trial by engaging in prejudicial misconduct during his opening statement and closing argument. This court reviews claims of prosecutorial misconduct and will reverse only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial. *State v. Johnson*, 616 N.W.2d 720, 727–28 (Minn.2000). When assessing prosecutorial misconduct, the closing argument will be considered as a whole. *Id.* at 728. There are two distinct standards. If the misconduct was serious, "the misconduct is harmless beyond a reasonable doubt if the verdict rendered was surely unattributable to the error." *State v. Hunt*, 615 N.W.2d 294, 302 (Minn.2000). For less serious misconduct, the standard is "whether the misconduct likely played a substantial part in influencing the jury to convict." *Id.* If the defendant failed to object to the misconduct at trial, he forfeits the right to have the issue considered on appeal, but if the error is sufficient, this court may review. *State v. Sanders*, 598 N.W.2d 650, 656 (Minn.1999).

Appellant asserts that in the following statement from closing argument the prosecutor improperly asserted his opinion that appellant's testimony was a lie and that the sarcastic nature of the prosecutor's comment compounded the misconduct.

Well, I'm not sure I have the energy to dignify and talk to you about Vernon

---

1. *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960), is the case that lends its name to hearings into improper influences on jurors in Minnesota.

Powers' testimony in here. I just don't think I can do it, and I'm not going to.

■ A prosecutor engages in misconduct if he expresses his personal opinion on the defendant's credibility as a witness. *State v. Ture,* 353 N.W.2d 502, 516 (Minn. 1984). This court has also held that it is misconduct to disparage the defense. *State v. Griese,* 565 N.W.2d 419, 427 (Minn.1997). The comment by the prosecutor does seem to disparage the defense and express an opinion on the credibility of the defendant. However, when viewed in context of the closing argument taken as a whole, as required under our case law, the statement does not amount to misconduct. *Johnson,* 616 N.W.2d at 727–28. The improper statement was only two sentences in a closing argument that amounted to over 20 transcribed pages.

■ The defendant also claims that the prosecutor engaged in misconduct during opening statement and closing argument by asking the jury to seek justice beyond the parameters of the case. The prosecutor brought his opening statement to a close as follows:

> Now, when we are done presenting these witnesses, Ladies and Gentlemen, we are going to ask you, like we already have, as citizens to come into this court to take a week out of your life to do the right thing. * * * We are asking you to find some justice for the people of Minnesota.

Appellant also points to the following excerpts from the prosecution's closing argument in support of this claim:

> Now, in my opening statement I asked you folks to seek justice, and one of the defense attorneys objected. I am asking you again now. Now I am asking you to seek justice, and I am asking you to do it without any objection. I am asking you to take this evidence and do the right thing with it. That's what we

are asking you to do. We are just asking you to do the right thing.

\* \* \* \*

> One last thing, folks, about that justice thing—you know, many years ago Edmond Burke, an old English jurist, said, "The only way for evil to triumph is when good people do nothing." Now it's up to you folks. You can either let evil prevail in this or justice prevail, and I am asking [you to do the] right thing.

■ It is improper for a prosecutor to "seek justice beyond the parameters of the case." *State v. Atkins,* 543 N.W.2d 642, 648 (Minn.1996). However, in *Atkins* we stated that it was proper for a prosecutor to ask the jury to "seek justice." *Id.* The mere addition of the phrase, "for the people of Minnesota," is not improper. The language used does not encourage the jurors to consider issues beyond the parameters of the case, nor does it hold the jury to a higher standard than is their obligation under the law.

■ The quotation from Burke is more troubling, however, because it was an improper call for justice beyond the parameters of the case. Nonetheless, in *State v. Stufflebean,* 329 N.W.2d 314, 318 (Minn. 1983), this court held substantially similar language to be "technically improper" but not warranting reversal. We reiterate the improper nature of such arguments, but we conclude that those comments do not warrant reversal.

## IV.

■ Appellant alleges that his absence from a hearing relative to a motion to dismiss counsel, a hearing with a juror regarding improper contact between the juror and the prosecutor, and a hearing to respond to questions by the jury during deliberations, amount to reversible error. Minnesota Rules of Criminal Procedure

26.03, subd. 1(1) states: "The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by these rules." In *State v. Ware*, 498 N.W.2d 454, 457 (Minn.1993), this court held that the right to be present is broader under the Minnesota Rules of Criminal Procedure than under the United States Constitution. In this case, the district court erred by not having appellant present at each of the three hearings of which appellant now complains. However, mere error will not result in relief for the appellant, if the error was harmless beyond a reasonable doubt. *See id.*

The first hearing from which the defendant was absent was an examination of his counsel by the trial judge. During the trial appellant made a motion to replace counsel. The judge held a hearing into the matter with appellant present. Appellant made an oral presentation of his motion to replace counsel. In that presentation he alleged that he had communicated in confidence with Sara Jane Olson, one of his attorneys, before he discovered that she was married to an attorney in the Mower County Attorney's Office. He concluded his oral presentation by moving to have new attorneys assigned and a continuance issued.

The judge asked Olson whether she had disclosed to her client the fact that she was married to an attorney in the Mower County Attorney's Office. Olson responded that she had disclosed the relationship the first time she met with appellant, in July of the preceding year. The judge noted that appellant had presented an ex parte motion to substitute counsel months before the trial, which was denied by the court in a written ruling. Having found that each of the matters raised by the

appellant in this new motion were known months before the trial and that the purpose behind the motion was to obtain a continuance and a severance, the judge concluded the hearing by denying all the motions brought by the appellant.

Later that same day the court held a hearing that appellant alleges he was absent from and did not know about until reviewing the transcript in preparation for this appeal. During this courtroom hearing the judge asked Olson three questions: whether formal waiver was given, whether appellant had objected to her representation of him for reasons of any relationship, and whether she had discussions or made disclosures to members of the Mower County Attorney's Office. Olson replied as follows: no formal written waiver was given, appellant had expressed concerns about the relationship, but in their many discussions on the issue consistently wished she continue in her representation, and she had not disclosed information to any member of the Mower County Attorney's Office.

The court made no ruling at the conclusion of the hearing. The timing, brevity and content of the hearing give the proceeding the character of a mere supplement to the record of the morning hearing. Appellant's presence at the hearing could not have changed the judge's ruling made earlier the same day when the judge ruled that appellant had known of the matters raised in his brief months before he presented his motion at trial. The court ruled that there was not sufficient basis to either substitute counsel or continue the matter. There is no evidence to indicate that appellant's presence at the afternoon hearing could have changed the result. Olson claimed to have discussed the matter with appellant in the afternoon hearing, just as she had done in the morning hearing. She admitted that appellant had signed no

written waiver, a fact that in no way worked against appellant's pro se motion. Finally, Olson denied having disclosed any information to the Mower County Attorney's Office. Appellant, had he been present, would not have been able to cast doubt on that response.

Appellant was also absent during the *Schwartz* hearing, where the judge examined the juror involved in the improper contact with the prosecutor. The nature of the contact between the prosecutor and the juror was so brief and innocuous that appellant's absence at the hearing into the matter can be considered nothing more than harmless error.

Appellant was also absent from a hearing conducted by the judge to respond to a question from the jury during the course of their deliberations. The question was, "If we find one defendant guilty of First Degree Premeditated Murder, does the other shooter's charge automatically become premeditated murder based upon liability for crimes of another?" The judge conducted a hearing with the attorneys for all parties present, but in the absence of the defendants. The judge then brought the jury into the courtroom and referred the jury to the relevant sections of the previously issued jury instructions.

In other cases where the issue of the absence of the defendant from the judge's response to a jury question was raised, this court has determined the defendant's absence to be harmless error. *See State v. Sessions*, 621 N.W.2d 751 (Minn.2001); *State v. Hudspeth*, 535 N.W.2d 292 (Minn. 1995). In *Hudspeth*, this court ruled the absence of the defendant during the judge's response to a jury question was, "harmless beyond a reasonable doubt because the trial court's answers were neutral and nonsubstantive and could not have played a significant role in the verdict." *Id.* at 295. In *Sessions*, the court conclud-

ed that because no new instructions were issued and the repeated instructions were neutral, the defendant's absence was not prejudicial to his defense. *Sessions*, 621 N.W.2d at 757.

In the case before us, the judge's response was neutral and he did not issue any new instructions. The judge pointed out the instruction regarding joinder of defendants, section 4.01 on aiding and abetting, and the definition of first-degree murder with premeditation and instructed the jury that they should read those sections together. Thus, we conclude appellant's absence from the hearing to respond to the jury's question harmless beyond a reasonable doubt.

## V.

█ Next, appellant claims he received ineffective assistance of counsel in violation of the Sixth Amendment. Appellant's ineffective assistance of counsel claim has two parts. First, he argues that in closing argument his defense counsel implied his guilt without his consent, and cites six portions of the closing argument to support that claim. Second, appellant claims that throughout the criminal proceedings his defense counsel's representation was so deficient as to deny him the right to adequate counsel.

The portions of the record cited by appellant in his pro se brief as admissions of guilt were taken out of context and were in fact defense counsel's comments on direct evidence, his attribution of testimony to various witnesses, an attempt to demonstrate that the physical evidence did not match the state's theory of the case, and a rhetorical question implying the state had failed to prove its case. The challenged statements do not amount to an admission of guilt. Therefore, we conclude appellant's claim is without merit.

As to appellant's second claim of deficient performance, the appellant must first show that the representation fell below an objective standard of reasonableness. *State v. Doppler*, 590 N.W.2d 627, 633 (Minn.1999). Considerable deference is given to the decisions of counsel in recognition of the wide range of reasonable professional conduct. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Here, there is no evidence in the record that appellant's counsel was deficient. As such, we conclude that appellant's Sixth Amendment right to effective assistance of counsel was not violated.

### VI.

Appellant claims that the requirement that he select the jury with his codefendants violated his right to an impartial jury and adequate voir dire. Appellant argues that a codefendant used preemptory challenges to strike several of the jurors that appellant found acceptable, thereby denying him a fair trial by an impartial jury. To succeed on a claim for the denial of an impartial jury, a defendant must show the existence of actual bias or prejudice. *State v. Barlow*, 541 N.W.2d 309, 312 (Minn.1995). In this case, appellant has failed to even allege bias on the part of any juror. Absent evidence of bias or prejudice, there is no basis for appellant's claim. We conclude that appellant's right to an impartial jury and adequate voir dire was not violated by having to select a jury with his codefendants.

Affirmed.