*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-2181**

State of Minnesota,
Respondent,

vs.

Emem Ufot Udoh,
Appellant.

**Filed February 22, 2016
Affirmed in part, reversed in part, and remanded
Minge, Judge\***

Hennepin County District Court
File No. 27-CR-13-8979

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Stauber, Presiding Judge; Kirk, Judge; and Minge, Judge.

_____

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**MINGE**, Judge

On appeal from his criminal-sexual-conduct convictions, appellant Emem Udoh argues that the district court abused its discretion by allowing expert testimony on the ultimate issue and erred by entering a conviction on a count of second-degree criminal sexual conduct. He also raises several issues in a pro se supplemental brief. Because the district court did not abuse its discretion by allowing the expert testimony and the issues in Udoh's pro se supplemental brief do not identify any reversible error, we affirm with respect to all of those matters. But because one of the second-degree criminal-sexual-conduct convictions is a lesser-included offense of the first-degree criminal-sexual-conduct conviction, we reverse and remand for that conviction to be vacated.

## FACTS

Udoh was charged with first-degree and second-degree criminal sexual conduct toward each of his stepdaughters, K.K.W. and K.C.W., ages 13 and 11 respectively at the time of trial. The K.K.W. counts alleged conduct that occurred between April 25, 2012 and February 19, 2013; the K.C.W. counts alleged conduct between June 20, 2012 and February 19, 2013. On February 19, 2013, a school social worker learned that K.K.W. spoke of being abused. K.K.W. told the social worker and the school liaison law enforcement officer that Udoh had touched both her and her younger sister, K.C.W., inappropriately.

Subsequently, K.K.W. told a Hennepin County child-protection worker that "there were several incidents where [Udoh] would . . . touch her . . . privates" and that she did not

feel safe. K.C.W. told the worker that no abuse had occurred and that she felt safe at home. Both girls were removed from their home.

Both girls were interviewed at CornerHouse. K.K.W. variously reported that Udoh touched "outside" her "private" with his hand and with "his private," that Udoh touched inside her underwear, that his finger went inside her "private area," and that Udoh laid on top of her "jerking his private into mine," but clarified that she "meant the outside" of her private. K.C.W. initially told CornerHouse staff that nothing had happened to her, but then admitted that she was "lying before," that "[i]t did really happen," and that Udoh "opens this thing" with "[h]is fingers" and "checks to see if we're having sex."

Both K.K.W. and K.C.W. were also examined by Dr. Linda Thompson, a CornerHouse pediatrician. They told Dr. Thompson that they had been molested by Udoh. Using an anatomically correct doll, K.K.W. indicated that Udoh touched the "innermost part of the genital area." K.C.W. again stated that Udoh told her he was checking to see if the girls were having sex and, by pointing, indicated that he touched her inside the genital opening.

At trial, both girls testified to their ages when the incidents occurred, what Udoh did, that T.U., their mother (and Udoh's wife), was at work at the time of contact, and that they told their mother about the contacts. While varying on some details, their testimony was similar to what they told the CornerHouse interviewer and Dr. Thompson. K.K.W. stated that when Udoh moved his private parts and something wet came out, he told her not to tell her mother, and that when she told her mother anyway, her mother did not believe her. On cross-examination, K.K.W. agreed that she and Udoh argued a lot, that it was

3

frustrating living with him, that he yelled at her about her grades and talking to boys, and that he gave her "whoopings." K.K.W. admitted that Udoh took her cell phone away right before she reported the abuse.

K.C.W. testified that Udoh used his hands to spread open her vagina and looked inside. K.C.W. thought that this "[p]robably" happened more than 15 times. K.C.W. "told him to stop a couple times, but he didn't." K.C.W. testified that she initially lied about not being abused because Udoh and her mom "told [her] not to tell or [she] would be in foster care and then we won't never see each other again." K.C.W. said that she told the truth at CornerHouse because the lies were confusing and she "got tired of it."

T.U. testified that K.K.W. had a reputation at home for lying and that K.C.W. was "a little sneaky," meaning that she too had been dishonest. T.U. also denied that the girls ever told her about any inappropriate touching. According to T.U., K.K.W. admitted to making up the allegations because she was mad that Udoh took her phone away. Udoh denied having sexual contact with his stepdaughters and testified that K.K.W. had a reputation at home for dishonesty.

The jury found Udoh guilty of both first-degree and second-degree criminal sexual conduct toward K.K.W. and of second-degree criminal sexual conduct toward K.C.W. The jury found Udoh not guilty of first-degree criminal sexual conduct toward K.C.W. The district court entered convictions on the three guilty verdicts and sentenced Udoh to 144 months in prison on the first-degree conviction related to K.K.W. and to a concurrent sentence of 70 months on the second-degree conviction related to K.C.W. The district

4

court did not impose a sentence on the second-degree conviction of Udoh with respect to K.K.W. This appeal followed.

**D E C I S I O N**

**I.**

The first issue is whether the district court abused its discretion in permitting Dr. Thompson, a medical doctor, to answer a question of whether Udoh's contact with K.K.W. was penetration. The district court has broad discretion regarding the admissibility of evidence, including expert testimony. *State v. Reese*, 692 N.W.2d 736, 740 (Minn. 2005). We review the district court's admission of expert testimony for an abuse of discretion. *State v. Goldenstein*, 505 N.W.2d 332, 341 (Minn. App. 1993), *review denied* (Minn. Oct. 19, 1993). When challenging an evidentiary ruling, the appellant must show both that the district court abused its discretion and that the appellant "was thereby prejudiced." *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003).

An expert may testify "in the form of an opinion or otherwise" if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. An expert may even provide "opinion testimony on ultimate issues if such testimony is helpful to the factfinder." *State v. Moore*, 699 N.W.2d 733, 740 (Minn. 2005). "[I]f the subject of the testimony is within the knowledge or experience of a lay jury and the expert would not be able to deepen the jury's understanding, then the testimony does not meet the helpfulness requirement and is not admissible." *Reese*, 692 N.W.2d at 740.

On direct, the prosecutor asked Dr. Thompson several questions about female anatomy and where K.K.W. indicated she had been touched. Dr. Thompson described a

diagram of female genitalia to the jury. She was then asked, based on the reported touching, the following questions:

> [PROSECUTOR]: In order to—for somebody to touch a female on their hymen, would they have to penetrate [the entrance to the genital opening]?
> [DEFENSE ATTORNEY]: Objection. Calls for a legal conclusion.
> THE COURT: Overruled. You may answer, doctor.
> . . . .
> [DR. THOMPSON]: In order to touch the hymen, these two sides have to have been separated; and so something has gone in there into the whole opening in order to get to the hymen.
> [PROSECUTOR]: Okay. So when we talk about something being inside of the genitals, the female genitals, there's more than one version of what inside might be. Is that fair to say?
> [DR. THOMPSON]: Yes.

Udoh challenges the above testimony, arguing that it "impermissibly interfered with the jury's determination of whether Udoh penetrated [K.K.W.'s] genitals." To convict Udoh of first-degree criminal sexual conduct toward K.K.W., the jury had to determine that he "engage[d] in sexual penetration with another person." *See* Minn. Stat. § 609.342, subd. 1 (2012) (requiring only "sexual contact" if the victim was under 13 years of age). Udoh argues that, because the prosecutor used the term "penetration" in her question, Dr. Thompson's answer "embraced 'legal conclusions or terms of art.'" *See Moore*, 699 N.W.2d at 740 ("Under the helpfulness test, this court has not allowed ultimate conclusion testimony which embraces legal conclusions or terms of art." (quotation omitted)). But our caselaw does not hold testimony to be erroneous simply for including the word "penetration." *See State v. Kroshus*, 447 N.W.2d 203, 205 (Minn. App. 1989) (stating that there was medical testimony that the victim had experienced vaginal penetration), *review*

6

*denied* (Minn. Dec. 20, 1989); *State v. Perez*, 404 N.W.2d 834, 837 (Minn. App. 1987) (noting a doctor's testimony that the victim "exhibited vaginal injury consistent with penetration"), *review denied* (Minn. May 20, 1987).

Udoh argues that the challenged testimony was similar to the improper expert testimony in *Moore*. In *Moore*, a doctor testified that the victim's injuries met the definition of great bodily harm. 699 N.W.2d at 739. The supreme court determined that because the doctor's testimony basically told the jury what result it must reach, it was not helpful to the jury. *Id.* at 740. The testimony was also not helpful because "[w]hether [the victim's] injuries constituted 'great bodily harm' was a question within the knowledge and experience of the jury." *Id.*

*Moore* is distinguishable because without further explanation from Dr. Thompson regarding female anatomy and correct medical terms, a lay jury likely lacked the knowledge and experience to determine whether Udoh "engage[d] in sexual penetration" by touching and viewing K.K.W.'s hymen. *See* Minn. Stat. § 609.342, subd. 1; *see also* Minn. Stat. § 609.341, subd. 12(2) (2012) (defining sexual penetration as being "any intrusion however slight into the genital or anal openings"). Dr. Thompson was not telling the jury what result it must reach. *See Moore*, 699 N.W.2d at 740. The testimony helped the jury determine whether Udoh intruded into K.K.W.'s genital opening and therefore "engage[d] in sexual penetration." *See* Minn. Stat. § 609.341, subd. 12; Minn. Stat. § 609.342, subd. 1. Because we conclude that Dr. Thompson's testimony was helpful to the jury, it follows that the district court did not abuse its discretion by overruling Udoh's objection and allowing the doctor to answer.

7

We also note that there is little likelihood that the challenged testimony "substantially influenced the jury's decision." *State v. Vang*, 774 N.W.2d 566, 576 (Minn. 2009) (quotation omitted). The record contained unobjected-to evidence of penetration: The prosecution had played the recording of Dr. Thompson's CornerHouse interview of K.K.W. as a prior consistent statement. Thus, the jury heard K.K.W. state that Udoh touched "inside" her underwear and that he went "inside of there" "[w]ith his finger." In addition, Udoh did not object to other portions of Dr. Thompson's testimony in which she explained that, using an anatomically correct doll, K.K.W. showed that Udoh touched inside her genital opening.

## II.

The second issue is whether the second-degree criminal-sexual-conduct charge with respect to K.K.W. was a lesser-included offense of the first-degree charge so that the district court erred in entering a conviction on both charges. "Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both." Minn. Stat. § 609.04, subd. 1 (2012). An included offense is "[a] lesser degree of the same crime." *Id.* Second-degree criminal sexual conduct is a lesser-included offense of first-degree criminal sexual conduct. *State v. Kobow*, 466 N.W.2d 747, 752 (Minn. App. 1991), *review denied* (Minn. Apr. 18, 1991). "The difference is simply one of sexual contact versus sexual penetration." *Id.*

Both the first-degree sexual-offense count and the second-degree count alleged that Udoh's conduct toward K.K.W. occurred between April 25, 2012 and February 19, 2013. Under this record, there is no evidence that the conduct supporting Udoh's conviction for

8

second-degree criminal sexual conduct is separate from the conduct supporting his first-degree conviction. Udoh's first-degree conviction for penetration therefore includes the second-degree conduct of sexual contact.

Because the count for the second degree is a lesser-included offense of the one for first degree, we remand for the district court to vacate the judgment on the second-degree offense against K.K.W.

**III.**

Udoh raises several additional issues in his pro se supplemental brief, including that (1) the district court abused its discretion by limiting cross-examination of K.K.W.; (2) the district court erred by admitting certain evidence; (3) the prosecutor committed misconduct; and (4) the district court erred by denying his motion for a judgment of acquittal.

**A.     Cross-Examination of K.K.W.**

Udoh first challenges the district court's ruling about the scope of questions regarding K.K.W.'s credibility. The district court has "broad discretion" to control the scope of cross-examination and may "impose reasonable limits on cross-examination of a prosecution witness." *State v. Lanz-Terry*, 535 N.W.2d 635, 639 (Minn. 1995). But the district court's broad discretion is limited by the Sixth Amendment, which guarantees a defendant the opportunity to cross-examine the witnesses against him. *Id.* at 640. "Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion." *Amos*, 658 N.W.2d at 203. "The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation"

regarding the witness's "character for truthfulness or untruthfulness." Minn. R. Evid. 608(a)(1). But, although a party may inquire about specific instances of the witness's conduct concerning truthfulness or untruthfulness, extrinsic evidence may not be used to prove those specific instances. Minn. R. Evid. 608(b).

Before trial, the prosecutor moved to prohibit Udoh's attorney from impeaching K.K.W. with prior instances of lying through cross-examination of her or any other witnesses. The district court determined that "evidence of the alleged victim's prior conduct is not admissible pursuant to Minnesota Rules of Evidence 404 or 405" because it is "impermissible propensity evidence" and "the alleged victim's veracity is not an essential element of [the] charge[s]." The district court stated that Udoh could "inquire into specific instances of lying on cross-examination of the alleged victim" but must accept the answer. He could not introduce extrinsic evidence of past conduct.

Udoh argues that the district court's ruling was improper under *Goldenstein*. In *Goldenstein*, we reversed the appellants' convictions because "the [district] court's exclusion of evidence of the prior false allegations violated [the appellants'] constitutional right to present a defense." 505 N.W.2d at 340. But here, although K.K.W. admitted lying, there is no evidence that she made a prior false allegation of *sexual abuse*. Because Udoh only sought to introduce evidence that K.K.W. lied and told crazy stories, *Goldenstein* is not on point. Udoh also cites *State v. Benedict*, which discusses the admission of evidence showing the victim's source of sexual knowledge. *See* 397 N.W.2d 337, 341 (Minn. 1986) ("[A] [district] court has discretion to admit evidence tending to establish a source of knowledge of or familiarity with sexual matters in circumstances where the jury otherwise

10

would likely infer that the defendant was the source of the knowledge."). Because Udoh did not seek to introduce evidence of K.K.W.'s sexual knowledge, *Benedict* is also not on point.

Under rule 608, the district court stayed within its range of discretion. It allowed Udoh to challenge K.K.W.'s credibility by asking about specific instances of untruthfulness. Because she admitted that she had not been truthful in those situations, they were not in dispute. The district court could prohibit Udoh from introducing extrinsic evidence regarding such undisputed, specific instances. Accordingly, we conclude that the district court did not abuse its discretion by limiting Udoh's cross-examination of K.K.W.[1]

## B.    Interview Evidence

Udoh next challenges the admission of evidence regarding the CornerHouse interviews and Dr. Thompson's testimony about her interviews of K.K.W. and K.C.W. on various grounds, including that the interviews were done without parental consent and that the CornerHouse and Dr. Thompson interviews were otherwise inadmissible. Udoh mentions a variety of additional objections which are not accompanied with analysis or legal argument. We conclude that these additional objections are not meritorious and do not further consider them.

---

[1] Udoh also appears to argue that the school social worker was biased against him and that the district court erroneously precluded him from cross-examining her regarding her biases. But the district court made no ruling about this cross-examination and only prevented Udoh from introducing extrinsic evidence to challenge K.K.W.'s truthfulness.

### 1.    *Parental Consent; General Constitutional Claims*

Once a local welfare agency receives a report of sexual abuse, it must conduct an investigation. Minn. Stat. § 626.556, subd. 10(b)(1) (2012). The agency has the "authority to interview, *without parental consent*, the alleged victim and any other minors who currently reside with . . . the alleged offender." *Id.*, subd. 10(d) (2012) (emphasis added). These authorized interviews may occur at school or any other facility. *Id.* The agency must only notify a parent "no later than the conclusion of the investigation or assessment." *Id.* Under this statute, county officials could interview K.K.W. and K.C.W. without a warrant, probable cause, or exigent circumstances. *See id.* In addition, the interviews did not require parental consent. *See id.* Furthermore, Udoh provides no evidence of any improper investigative procedures.

Given Minnesota's statute and the lack of applicable legal authority requiring a warrant or exigent circumstances to interview a suspected child victim of abuse, we conclude that the interviews did not violate any constitutional rights that may be asserted by Udoh.

### 2.    *CornerHouse Interviews*

We review Udoh's assertions that the district court improperly admitted the CornerHouse interviews into evidence for an abuse of discretion. *Amos*, 658 N.W.2d at 203. The district court overruled Udoh's hearsay objection to the CornerHouse interviews and admitted the videos as prior consistent statements. A witness's prior statement that is consistent with the witness's testimony is not hearsay and is admissible if it is helpful to the jury in evaluating the witness's credibility. Minn. R. Evid. 801(d)(1).

The district court determined that although K.K.W.'s and K.C.W.'s testimonies were "not identical" to their CornerHouse statements, they were "reasonably consistent." In reviewing the record, we conclude that the district court did not abuse its discretion in determining that the girls' testimony was "reasonably consistent" with their CornerHouse statements.

In addition, the district court determined that the credibility of both K.K.W. and K.C.W. was challenged during their cross-examinations so the CornerHouse statements "would be helpful to the jury in evaluating their credibility." Udoh challenged K.K.W. about her truthfulness and relationship with Udoh, and pointed to K.C.W.'s initial statements denying abuse. Given the girls' respective testimony, their CornerHouse statements were helpful to the jury in evaluating their credibility. We conclude that the district court did not abuse its discretion in admitting the CornerHouse interviews as prior consistent statements.

### 3. Dr. Thompson's Interviews

Udoh appears to argue that Dr. Thompson's testimony was erroneously admitted because she did not record her interviews with K.K.W. and K.C.W. Because Udoh did not challenge this testimony at trial, we apply a plain-error standard of review. *See State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). Before reviewing "an unobjected-to trial error, there must be (1) error, (2) that is plain, and (3) affects substantial rights." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006).

Udoh does not cite to and we are not aware of any legal requirement that Dr. Thompson record her interviews. Udoh does not allege that Dr. Thompson's written report,

13

which she referred to at trial, was deficient in any respect. Udoh also appears to argue that Dr. Thompson's interview of K.K.W. was insufficient because K.K.W. did not watch the screen during her physical examination. But Dr. Thompson testified that only about 50% of children watch the screen during their examinations. And even without watching the screen, K.K.W. was able to identify where Udoh touched her. Udoh cannot establish plain error regarding Dr. Thompson's testimony. *See id.* (explaining that a plain error must be clear or obvious).

### C. Prosecutorial Misconduct

Udoh alleges that the prosecutor committed misconduct in (1) opening argument; (2) questioning witnesses; and (3) closing argument. Udoh also argues that the "cumulative effects" of prosecutorial misconduct violated his due-process and equal-protection rights. Most of his claims on appeal were not objected to at trial. The plain-error standard of review applies when no objection is made at trial. *Id.* at 299. If the appellant shows that the misconduct violated caselaw, a rule, or standard of conduct, the burden shifts to the state to show that the misconduct did not prejudice the defendant's substantial rights. *Id.* at 299-300. Furthermore, we "will reverse [a claim of generalized prosecutorial misconduct] only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial." *State v. Powers*, 654 N.W.2d 667, 678 (Minn. 2003). "If the misconduct was serious, the misconduct [must be] harmless beyond a reasonable doubt [meaning that] the verdict rendered was surely unattributable to the error. For less serious misconduct, the standard is whether the misconduct likely played a substantial part in influencing the jury to convict." *Id.* (quotations and citations omitted).

14

### 1. *Opening Argument*

Udoh first challenges the beginning of the prosecutor's opening argument on the ground that it erroneously stated that Udoh sexually abused T.U. But in making his challenge, Udoh focuses on a phrase in a single sentence of the prosecutor's argument; we must consider the prosecutor's statement as a whole. *See State v. Walsh*, 495 N.W.2d 602, 607 (Minn. 1993). It is clear from the full context that the prosecutor did not argue or make a claim that Udoh sexually abused T.U. We conclude that the assertion that the prosecutor's allusion to T.U. discredited her is not meritorious.

Udoh also asserts that the prosecutor erred by stating that the girls were "victims of sexual abuse." Before trial, Udoh's attorney moved the district court to direct "the parties to refer to K.K.W. and K.C.W. as complaining witnesses rather than as [victims]" because "[t]he ultimate issue in this case is whether or not they were victims . . . of sexual abuse." The district court allowed the prosecutor to refer to them as victims or alleged victims in opening and closing arguments as long as the prosecutor did not "overuse that word." The prosecutor only referred to K.K.W. and K.C.W. as "victims" once in her opening argument. She also twice referenced a generic victim of sexual abuse. We conclude the prosecutor's statement was not misconduct, let alone serious misconduct.

### 2. *Questioning Witnesses*

Udoh asserts that, when questioning witnesses, the prosecutor asked "misleading questions" and made "suggestive comments on facts." Udoh's attorney made several objections that the prosecutor was improperly leading the testimony of K.K.W. and K.C.W., and the district court overruled the objections. "Leading questions should not be

15

used on the direct examination of a witness except as may be necessary to develop the witness'[s] testimony." Minn. R. Evid. 611(c). But in context, leading questions were necessary to develop K.K.W.'s and K.C.W.'s testimony given the girls' ages and explanations of events. *See* Minn. R. Evid. 611(c) cmt. (stating that leading questions can be "necessary to develop testimony because of temporary lapse of memory, mental defect, immaturity of a witness, etc.").

Udoh also challenges the prosecutor's questions to T.U. about her relationship with the girls' father.[2] Udoh's attorney objected to this questioning. But the district court overruled the objection. It reasoned that while testifying on Udoh's behalf, T.U. had stated that the girls wanted to live with their dad and that this prior testimony opened the door to further questioning about the girls' father and the girls' reasons for wishing to live with him. *See State v. Bailey*, 732 N.W.2d 612, 622 (Minn. 2007) (explaining that when one party opens the door "by introducing certain material," the other party has "a right to respond with material that would otherwise have been inadmissible" (quotation omitted)). Regardless, there is no evidence that this brief portion of T.U.'s testimony about the girls' father prejudiced Udoh. Udoh's attorney rebutted the prosecutor's questions in closing by arguing that the girls "fantasized" that life would be better with their dad. We conclude

---

[2] Udoh refers to this as "relationship evidence," but relationship evidence is evidence of similar conduct *by the defendant* against the victim of domestic abuse or other family members. *See* Minn. Stat. § 634.20 (2012). Evidence of the relationship between T.U. and the girls' father is not relationship evidence and does not require any special jury instructions. *See State v. Word*, 755 N.W.2d 776, 783, 785 (Minn. App. 2008) (defining relationship evidence and stating that such evidence requires a cautionary instruction).

that any testimony about the girls' father's abusive behavior had no effect on the jury's verdict against Udoh.

Udoh makes several other arguments about the questioning of witnesses, including that the prosecutor, "elicited false testimonies from government[] witness[es]," withheld evidence, improperly asked K.K.W. and K.C.W. whether they were telling the truth, and "made improper objections . . . to prevent the admission of relevant evidence." We find no support for these allegations. Small inconsistencies among different witnesses do not create an inference that the prosecutor elicited false testimony or withheld evidence. Udoh identifies no legal basis for his claims that the prosecutor's questions or objections were improper. Many of Udoh's cited objections were sustained by the district court, but we conclude that none of the adverse rulings was an abuse of discretion.

### 3. Closing Arguments

Udoh asserts that the prosecutor improperly endorsed the credibility of the state's witnesses. The prosecutor stated: "[K.K.W.] has no reason to lie to you" and "[K.C.W.] just like her sister has no reason to lie to you." She also stated that, if the girls had told the story "the same exact way every single time," she "would have been concerned these girls were lying." Finally, the prosecutor stated that she could not "think of a single reason" why the girls would lie about telling their mom about the abuse. "A prosecutor may argue as to the credibility of witnesses but may not throw [her] own opinion onto the scales of credibility." *State v. McNeil*, 658 N.W.2d 228, 235 (Minn. App. 2003). As in *McNeil*, we conclude that here any error in a limited assertion of the girls' credibility in closing

17

argument is harmless given the girls' "descriptive and detailed testimony" regarding the abuse. *See id.* at 236.

Udoh also challenges the prosecutor's statement that part of Udoh's argument is a "red herring." A prosecutor may use the phrase "red herring" to "anticipat[e] those aspects of the evidence that the state need not prove at all but [to which] the defense [is expected to] attach unwarranted significance." *See State v. Moseng*, 379 N.W.2d 154, 156 (Minn. App. 1985).[3] The prosecutor was also free to discuss the girls' testimony about "whoopings," which was introduced by Udoh, to anticipate Udoh's argument that the girls lied because they were mad at him for punishing them. *See id.* As with opening statements, Udoh claims that the prosecutor's use of the word "victim" was prejudicial error. Twice in closing the prosecutor used the word "victim" to refer to K.K.W. and K.C.W. and three times to refer to the general investigative process. We conclude that use was within the limits allowed by the district court and does not constitute misconduct or prejudicial error.

Udoh cites several other statements during the prosecutor's closing arguments as evidence of prosecutorial misconduct. But, reading the arguments as a whole, *see Walsh*, 495 N.W.2d at 607, we can find no evidence of prosecutorial misconduct. Even if there was misconduct, it did not "play[] a substantial part in influencing the jury to convict" because the other evidence of Udoh's guilt was strong. *See Powers*, 654 N.W.2d at 678 (quotation omitted).

---

[3] Udoh's cited case involves a prosecutor attacking the *defense attorney* in closing argument to suggest that the attorney conspired with the defendant to fabricate testimony. *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005). The prosecutor here made no such personal attacks against Udoh's attorney.

18

## D.    Denial of Motion for Judgment of Acquittal

Finally, Udoh argues that the district court erred by denying his motion for a judgment of acquittal because the evidence was insufficient to sustain his convictions. "At the close of evidence for either party, the defendant may move for . . . a judgment of acquittal on one or more of the charges if the evidence is insufficient to sustain a conviction." Minn. R. Crim. P. 26.03, subd. 18(1)(a). To grant this motion, the district court must determine "whether the evidence is sufficient to present a fact question for the jury's determination, after viewing the evidence and all resulting inferences in favor of the state." *State v. Slaughter*, 691 N.W.2d 70, 74-75 (Minn. 2005).

Udoh argues that the evidence was insufficient to show that he touched K.K.W. and K.C.W. with sexual intent. Viewing the record, we conclude that the state's evidence was "sufficient to present a fact question for the jury's determination." *See id.* at 75.

Udoh further argues that the evidence was insufficient to show that he met the requirement that to convict on the various degrees of sexual misconduct he was 48 or 36 months older than K.K.W. and K.C.W. Udoh's trial counsel specifically raised this issue in requesting reconsideration of the denial of his motion for a judgment of acquittal. In its case, the state established both girls' birthdays, ages at trial, and ages when the alleged abuse occurred. On cross-examination of Udoh, the state established Udoh's birthday and his age. Udoh presents no caselaw requiring the state to establish Udoh's age in its case in chief. And even before Udoh testified, the state had a "common sense argument" that Udoh met the age-difference requirement because the girls were 13 and 11 and Udoh was an adult, a college graduate, and married to the girls' mother. The evidence was sufficient for

19

the jury to conclude that Udoh was more than 48 months older than the girls at the time of the alleged offenses.

Finally, Udoh argues that the evidence was insufficient to support his convictions because the state did not establish specific dates for his offenses. The complaint listed a range of dates for Udoh's offenses, rather than specific dates. "[S]pecific dates need not be charged or proven in a sexual abuse case." *State v. Poole*, 489 N.W.2d 537, 544 (Minn. App. 1992), *aff'd*, 499 N.W.2d 31 (Minn. 1993). The girls' testimony supported the range of dates listed in the complaint.

Because the evidence was sufficient to submit the case to the jury, we conclude the district court did not err by denying Udoh's motion for a judgment of acquittal. *See Slaughter*, 691 N.W.2d at 74-75.

**Affirmed in part, reversed in part, and remanded.**